Carl SCHNELL and The Griffith Laboratories, Inc., Plaintiffs-Appellees,

v.

The ALLBRIGHT–NELL COMPANY, and Peter Eckrich & Sons, Inc., Defendants-Appellants.

Carl SCHNELL and The Griffith Laboratories, Inc., Cross-Appellants,

v.

The ALLBRIGHT–NELL COMPANY, and Peter Eckrich & Sons, Inc., Cross-Appellees.

Nos. 14619, 14620.

United States Court of Appeals Seventh Circuit.

July 9, 1965.

Charles J. Merriam, Chicago, Ill., Norman M. Shapiro, Owen J. Murray, Jr., Chicago, Ill., Merriam, Marshall, Shapiro & Klose, Chicago, Ill., of counsel, for Schnell.

Richard D. Mason, M. Hudson Rathburn, Robert L. Rohrback, Clemens Hufmann, Chicago, Ill., Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., of counsel, for Allbright-Nell Co.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Plaintiffs-appellees, Carl Schnell and The Griffith Laboratories, Inc., brought this action in the United States District Court to recover damages for patent infringement. The District Court held that each of plaintiffs' patents, as follows:

| Patent Number | Claims |
| --- | --- |
| 2,840,318 | 2 |
| 2,906,310 | 1 through 8 |
| 2,934,120 | 1 and 2 |
| 2,934,121 | 1 through 24 |
| Re. Pat. 24,765 | 1 through 3 |
|  | 5 through 15 |
| 3,044,514 | 1 through 14 |
|  | 17 and 18 |
| Re. Pat. 24,683 | 1 through 16 |

were valid and infringed by defendants. The defendants, The Allbright-Nell Company and Peter Eckrich & Sons, Inc., have appealed from that judgment.

After the District Court's decision but prior to the entry of the decree, defendants urged that the decree should provide for no injunction or damages with respect to Re. Pat. 24,683 on the ground that defendants had been released under that patent. The decree as issued was silent as to relief with respect to Re. Pat. 24,683, and plaintiffs have filed a cross-appeal based on that omission.

The District Judge made extensive and detailed findings of fact,[1] more than 270 in number, which defendants attack as not in the spirit of Federal Rules of Civil Procedure, Rule 52(a), and as not entitled to the protection usually afforded findings of fact by the Rules.

██ Defendants complain that the findings of fact were adopted without change or comment, with only slight omissions, from those suggested by plaintiffs. The defendants cite criticism of such wholesale adoption of one party's proposed findings of fact as not revealing the discerning line for decision of the basic issue in the case. United States v. Forness, 2 Cir., 1942, 125 F.2d 928, 942; United States v. El Paso Natural Gas Co., 1964, 376 U.S. 651, 657, 84 S.Ct. 1044, 12 L.Ed.2d 12.

There is no question that such findings of fact are formally the findings of fact of the Court and must stand if supported by the evidence, even if they may be, as the Court in El Paso asserts, less helpful to the Appellate Court than findings of fact personally drafted by the Trial Judge might have been. 376 U.S. 656, ftn. 4, 84 S.Ct. 1044.

The defendants further contend, however, that the findings of fact in this case are not so supported and are clearly erroneous.

██ The findings of fact in this case are abundantly annotated with references to documentary evidence and testimony of witnesses, making it a comparatively simple matter for this Court to determine that the findings are supported by the evidence and are not "clearly erroneous." We are satisfied that the proper standards have been applied by the District Court in holding the patents valid and infringed. Graver Tank & Mfg. Co. v. Linde, 1949, 336 U.S. 271, 274–275, 69 S.Ct. 535, 93 L.Ed. 672; Armour & Co. v. Wilson & Co., 7 Cir., 1960, 274 F.2d 143, 156–157; Hazeltine Research v. Admiral Corp., 7 Cir., 1950, 183 F.2d 953, 954–955 cert. den. 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650; O'Brien v. O'Brien, 7 Cir., 1953, 202 F.2d 254, 255.

Defendants see these patents as relating to comminuting machines, which merely reduce larger relatively solid substances to minute particles, with elements and functions all old in the comminuting art. It is not disputed that prior to Schnell's discoveries cutters and grinders were in use by sausage manufacturers and others. Defendants refer to batch type comminuting machines called "mixers" used in Germany in 1952 to grind up various materials for pigs' feed.

Carl Schnell of West Germany had been making vegetable "musers" which defendants describe as continuous comminuting machines and which plaintiffs call a glorified Waring Blender in which knives rotate in a batch of liquid material. In 1954, Mr. Schnell found that he could cut raw pork rinds to produce a better emulsion which would be suitable for human consumption.

While some forms of sausage use meat in coarsely ground form, most varieties, such as frankfurters and bologna, use emulsions of solid meat and fat in a liquid carrier, which must not separate out into water and fat. The sausage industry utilizes residual portions of trimmings of meat, much of which contains hard gristle which has nutritional value, but which previously was not always found usable.

Mr. Schnell learned that he could emulsify even these hard particles. The defendants contend that Mr. Schnell's vegetable musers were used for this purpose with no substantial changes and that the

1. Published in 242 F.Supp. 891.

musers originally were substantially similar to the prior art Hortnagel patent (Austrian Pat. 179,437, issued 1954, Fodder and Beet Mill).

The original machines were not satisfactory for either large scale production or the finest sausages and plaintiffs view them as having been only the springboard for Mr. Schnell's real discovery that one secured a superior product and greatly increased output when the meat, fat and water were comminuted and discharged in the absence of air by sealing off air from the column of meat passing through the machine. Mr. Schnell testified that the machine with the seal aspirated like a pump. The plaintiffs describe the plastic meat material emulsified in the absence of air as existing in a hydraulic column. Mr. Schnell also testified that the small motors previously used burned out when used with the new machines which required greater power.

Plaintiffs' witness, William J. Turner, employed by Griffith Laboratories, Inc., testified that for the past seven years he had been engaged in servicing and demonstrating plaintiffs' Mince Master machines. He testified to the problem of temperature rise involved in comminuting action which was dangerous for perishable edible products. The full power of the motor is translated into heat energy most of which is released into the small zone through which the meat is passing at a rate comparable to that produced in a large furnace. Yet to avoid deterioration of the product, the zone must not be warmed in excess of about 15 degrees.

The plaintiffs point out that in a slow speed grinder much of the heat energy will be lost by conduction through the metal walls of the machine, but when the power input is doubled, little additional heat will be lost by conduction, and when the power is further multiplied, the extra energy will be dissipated as heat into the material being ground.

Mr. Schnell discovered that by maintaining a hydraulic column in which the plastic meat was substantially air free, · efficiency of comminuting was so increased that more power was applied to the device with less temperature increase in the meat because the increase in the rate of the meat flow through the machine exceeded the added power.

As the plaintiffs explain, when particles separated by air pass through a grinding machine, a particle propelled by a knife may hit a particle ahead of it which is moving more slowly, but will have no effect on the following particles. In the absence of air, the movement of any particle will pull along those particles behind it and the action of a knife on one particle in a sealed plastic column affects the whole hydraulic column.

This now seems simple and obvious in the light of the Schnell teaching, but it was evidently not at all obvious at the time of the invention. Those working in the field did not accomplish Schnell's results. That fact supports the conclusion that Schnell achieved patentable inventions. Pyle Nat. Co. v. Lewin, 7 Cir., 1937, 92 F.2d 628, 630.

The defendants argue that a "hydraulic column" was present although not so described in the prior art. The defendants compare the physical elements in the prior art devices with the patented devices and conclude that these were all well known. The District Court had the benefit of two experts' testimony: defendants' witness Clarence T. Fishleigh and plaintiffs' witness Karl E. Schoenherr. We have also read their testimony. We believe that it is only in the light of hindsight that the prior art seems to disclose the Schnell invention and to lend itself to the modifications now suggested by the defendants to adapt that prior art in the direction of attempts to accomplish the function of the patents. The defendants, however, did not develop their own device from the prior art but from Schnell. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 450, 55 L.Ed. 527.

The prior art, including Hortnagel, avoided increases in size of motor with attendant increases in temperature.

Hortnagel even provided for an air intake. The principal prior art on which defendants rely was considered by the Patent Office. Of the few patents not so considered, none appear any more pertinent than those which were cited or considered. That factor also adds weight to the presumption of validity of the patents. Hunt v. Armour & Co., 7 Cir., 1950, 185 F.2d 722, 726; Lewyt Corp. v. Health-Mor Inc., 7 Cir., 1950, 181 F.2d 855, 857, cert. den. 340 U.S. 823, 71 S. Ct. 57, 95 L.Ed. 605.

Mr. Schnell's discovery made possible a tremendous increase in production of sausage. Mr. Turner testified that using older unsealed machines an operator had time to stop and rest between insertion of batches of meat, but with the new Schnell machine two operators were continuously engaged in shoveling meat into the hopper. He spoke of production at 200 pounds per minute with a temperature rise of only 10 degrees.

Edwin B. Cypser, manager of production control of sausage for Armour & Co., engaged in Armour's sausage production for 33 years, testified to the changes wrought. He spoke, for example, of the employment of "artist" chopper operators, highly skilled, highly paid workmen who decided how long particular batches of meat were to be chopped. He said that there were no set standards; one depended on the personal temperament and knowledge of this key operator. If he were absent, no sausage could be made. The services of this highly skilled artist are no longer required.

Mr. Cypser said that in 1958 his sausage division at Armour was running a deficit of about $2 million. Then he heard about the Schnell Mince Master. Eighteen months later, he had a profit of $4 million, of which he attributed about $1 million to the Mince Master program, which cut the time of 12 to 15 minutes previously spent in the preliminary chopper to only 4 or 5 minutes. He testified to savings of about $2 per hundredweight. Sausage materials normally not susceptible to chopping were now being used.

Mr. Cypser spoke of eye appeal as an important element in selling sausage. He said nutritious shank meat has tendons which are difficult to chop out. High protein material with visible spots of gristle were objectionable to customers. The industry shied away from cheap, nourishing, but tough beef cheeks. These were now usable.

Fred Raymond Swanson testified to his extensive experience in the sausage business with various firms beginning in the mid 1920's. He described similarly startling changes in operation following the Schnell discovery. He said that the John Morrell Company experienced savings of up to 4 cents per pound on some items.

In developing his machine, Mr. Schnell made some structural changes to gain certain advantages, e. g. the shapes of the propelling knife and the obstructing and circulating surfaces that coöperate with it; the perforate plate and obstructing means.

█ The evidence supports the finding that Schnell satisfied a long felt want and met with prompt commercial success: another point supporting validity. Copeman Laboratories Co. v. General Plastics Corp., 7 Cir., 1945, 149 F.2d 962, 964.

In September of 1956, Griffith Laboratories, which was Mr. Schnell's United States agent, first received his sealed, more powerfully motored Mince Master machine, which was later discovered to be capable of developing between 75 and 80 horsepower. This was sent to Saratoga Meat Company in Chicago for testing. The machine was shown at the American Meat Institute Convention that same month. Also on display at the same Convention was a "Cutfix" machine which Carroll L. Griffith, president of the Griffith Laboratories, described as a copy, made in Europe by the Friess Company, of a Schnell machine without the seal which shut out air. Both machines were seen by representatives of The Allbright-Nell Company.

Norman Allbright, then president of The Allbright-Nell Company, sought without success to make arrangements

with Mr. Griffith to manufacture the Schnell Mince Master. Mr. Griffith testified that he warned Mr. Allbright that Mr. Schnell expected to be granted patents and that he would defend them.

Allbright-Nell Company acquired a Friess Cutfix. According to the deposition of its chief engineer, Ralph W. Illsley, Allbright-Nell reconstructed the Cutfix metric system noninterchangeable parts, part for part, on American standards with parts which could be replaced in the field. Subsequently an Americanized Cutfix was sent by Allbright-Nell to Peter Eckrich & Sons, Inc., for testing and modification. Eckrich also obtained a sealed Mince Master late in 1957 which was put into actual use in production and which was known to produce a satisfactory brand of sausage. It was observed by Vincent S. Sondej who came to work for Allbright-Nell in January 1954 as design-draftsman and rose to the post of design engineer. For a time he had been a salesman but returned to the development department as design engineer. At the time he testified he was assistant to the department manager.

Mr. Sondej testified that his department was trying to produce a machine as good or better than the Mince Master. Eckrich made a horizontal emulsifier which was tested in December 1957. In April 1958, Eckrich bought another Mince Master from Griffith as a standby for its first Mince Master. The defendants made and sold their own horizontal machines as Anco Emulsitators. We are satisfied from our study of the record that grinders and strainers such as the prior art devices, however fine, do not produce a homogeneous emulsion. As plaintiffs point out, the defendants did not merely speed up the grinders which they already had. They built an emulsitator.

We have examined the exhibits with care, and we agree with the District Judge that it makes no material difference that the knife in the defendants' Emulsitators rotates vertically about a horizontal axis instead of horizontally about a vertical axis as in Schnell. The defendants' Emulsitators do the same work in substantially the same way as the Mince Masters and produce substantially the same results.

We have paid particular attention to the various "tests" from which the parties draw conflicting conclusions. For example, the defendants assert that introduction of coloring matter resulting in a uniform color of the meat at the discharge outlet is not evidence of retrograde recirculation. Like the District Judge, we find more logical the reasoning of the plaintiffs that injection of dye twice per second into the defendants' Emulsitator comminuting chamber, with the meat moving forward about 5 inches between the injections, would not result in uniform distribution of the dye throughout the discharged meat in the absence of retrograde recirculation of coloring matter and meat. In plaintiffs' tests carbon black was introduced into the Emulsitator feeding hopper at 6-inch intervals and the discharged material was uniform at all points between the injection points. There must have been retrograde recirculation.

It is clear that defendants' machines are sealed and do provide a hydraulic column. We have devoted detailed study to the assertions of the defendants that their machines do not infringe the claims in suit, contrary to the precise findings of the District Court. A typical attack on the Trial Court's findings is the assertion that reference to centrifugal movement which might bend a copper tube is misleading because it has no relation to circulation. The District Court was referring not only to the circulation above and in advance of the knife area as so violent as to bend a quarter-inch copper tube when placed at the lower part of the neck, but also the fact that the circulation at the top of the neck did not have this degree of violence. He reasoned that this showed the presence of recirculation. He also referred to the delivery of meat to the valve plate at a speed of 1000 inches per second, passing through the holes in the plate at a rate of less than 10 inches per second and rea-

soned that the rest of the material must be moved backward and mixed with inflowing material. Unlike the defendants, we find the Trial Judge's reasoning persuasive.

Similarly the defendants criticize the District Court's application of the term "continuous annular lug" to the smooth continuous circular edge in defendants' machines at the juncture of the throat of the machine with the top wall of the comminuting chamber. They contend that none of the claims calling for lugs are infringed by the defendants' commercial machines which do not employ that element. Recourse to the evidence which the Trial Court obviously accepted discloses references to a "lug ring."

We have considered all of the defendants' comments on the various findings, but deem it unnecessary to discuss each one. The above examples should suffice.

■■ With respect to the reissue patents it seems to us that the file history supports the finding of the Patent Office that mere "error without any deceptive intention" occurred here. Topliff v. Topliff, 1892, 145 U.S. 156, 12 S.Ct. 825, 830, 36 L.Ed. 658; Benger Laboratories, Ltd. v. R. K. Laros Co., 3 Cir., 1963, 317 F.2d 455, 456, cert. den. 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64. The entire disclosure of the original patent does support the claims in the reissue. Application of Handel, CCPA, 1963, 312 F.2d 943, 948–949; Richmond Engineering Co. v. Bowser, Inc., 4 Cir., 1959, 264 F.2d 595, 598, ftn. 1. Nor do we find any intervening rights in the defendants who have infringed valid claims of the original patent which were retained unchanged in the reissue. Weller Mfg. Co. v. Wen Products Inc., 7 Cir., 1956, 231 F.2d 795, 799.

■ We also agree with the District Court with respect to the issue of double patenting. The basic invention does not solve all the subsidiary problems, solutions to which present separate and distinct inventions. Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 7 Cir., 1960, 281 F.2d 252, 257. The patent examiners were well aware of the various pending and issued Schnell patents.

We have scrutinized all of the defendants' points and authorities, but find no basis for reversing the determinations of the District Court in Appeal No. 14619, which is affirmed.

■ We also affirm the decision of the District Judge with respect to the Cross-appeal No. 14620. The plaintiffs contend that the defendants failed to accept the plaintiffs' conditional offer of a license under Re. Pat. 24,683, electing instead of seek determination of the issues of validity and infringement. The plaintiffs explain that by their letter, part of which is quoted below, they offered to release the defendants, but that, because of the defendants' failure to accept this offer, the plaintiffs were forced to elect to take a dismissal with prejudice under Re. Pat. 24,683 or charge it to be valid and infringed.

The letter states in part:

"It has not been plaintiff's policy to require from anyone a royalty under United States Letters Reissue Patent No. 24,683, which reissue patent is referred to in the above action. Therefore, with respect to said reissue patent, and said reissue patent only, defendants are released as to the past and future use of:

(1) All machines sold or leased to date by them, or either of them; and

(2) All machines which may be hereafter sold or leased by them, or either of them, until a future date of which each of the defendants will be informed by notice at least 90 days before said future date."

\*    \*    \*    \*    \*    \*

"With reference to sub-part (2) above, if such notice is given, it will specify a royalty for use of machines made, leased or sold after said future date; and this same royalty will be charged by plaintiffs, as a separate item, for use of machines sold or leased by plaintiffs under said

reissue patent 24,683, or either of them, in this country."

It constituted an unconditional release. No notice of termination had been given at the time of the hearing before the District Judge on the form of the judgment to be entered.

The actions of the defendants in resisting a finding of validity and infringement were not inconsistent with their availing themselves of the release insofar as it covered their activities up to 90 days after receipt of the notice of termination to which the letter refers, whenever and if such notice should be given.

Jurisdiction of this cause was specifically reserved in the District Court for award of attorneys' fees and damages at some reasonable date after expiration of time for appeal or after mandate.

Affirmed.