MERCANTILE NATIONAL BANK OF CHICAGO, Harold I. Snyder, Snyder Manufacturing Co., Incorporated, Zimmer Manufacturing Company, Plaintiffs-Appellees,

v.

QUEST, INC., Paul E. Magers, Defendants-Appellants.

No. 17694.

United States Court of Appeals, Seventh Circuit.

Aug. 13, 1970.

———◆———

Harold B. Hood, Hood, Gust, Irish & Lundy, Indianapolis, Ind., for defendants-appellants.

Olson, Trexler, Wolters & Bushnell, Richard R. Trexler and John S. Fosse, McConnell, Curtis, Mahon & Borst, Francis J. McConnell, Chicago, Ill., Graham, Rasor & Harris, Robert L. Rasor, Warsaw, Ind., for plaintiffs-appellees.

Before SWYGERT, Chief Judge, and KILEY and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiff-appellees filed suit alleging acts of infringement by defendants-appellants of their patented wound evacuator, an apparatus providing closed wound suction, and acts of unfair competition. The district court entered a judgment order finding the patent valid and infringed. Defendants appeal.

The "evacuator" is a surgical device sold under the trade name of "Hemovac," for the removal of fluids from the human body. The device consists of two circular plastic outer walls held together by a flexible plastic side wall. Within the container are four spirally retained compression springs, which after the container is depressed and the stopper replaced, develops a vacuum against which the springs exert a steady pressure drawing off body fluids through a flexible plastic tube, one end of which is attached to the top of the container and the other is inserted in the vicinity of the wound. The device is light weight and is capable of being strapped to the patient for mobility. The container, when filled with fluid, is easily removed and replaced with a new sterile container, or drained of the fluids with little inconvenience to the patient. Further, the device does not require any vacuum developing machinery for activating the suction process. The inventors claim ease in shipment and economical cost as compared to other similarly operated devices.

The patent was developed by Dr. R. T. McElvenny, an orthopedic surgeon before his death, in conjunction with his assistant, Gregory Sullivan, and Harold I. Snyder. In January, 1960, a prototype was demonstrated before the Academy Meeting for Orthopedic Surgeons. The first devices for sale were manufactured by Snyder Manufacturing Co. (Snyder) and delivered to Zimmer Manufacturing Co. (Zimmer), distributor, about July, 1960.

Application for letters patent were filed on July 14, 1960, and Serial No. 42,889 was issued; Letters Patent No. 3,115,138 were granted December 24, 1963, for "Evacuator" to Robert T. McElvenny, Harold I. Snyder and Gregory B. Sullivan.[1]

Paul E. Magers was employed by Zimmer in January, 1959, and attended the Academy Meeting for Orthopedic Surgeons in January, 1960, as Zimmer's general manager. His attendance was motivated by the necessity of evaluating new products. At this meeting, Magers through Allan Ramsey, the Zimmer products distributor in Chicago, became aware of the McElvenny evacuator device. Simultaneously at this meeting Magers met representatives of DePuy Manufacturing Co., a competitor of Zimmer which resulted in employment of Magers by DePuy in June of 1960.

---

1. The patentees assigned all rights under their patent to plaintiff Snyder Manufacturing Company. Plaintiff Snyder in turn licensed plaintiff Zimmer to distribute and sell the patented product.

In August or September of 1960, Magers and J. Keaton Landis of DePuy visited with Dr. McElvenny and Gregory Sullivan in Chicago and discussed the development of the evacuator. Being informed that Dr. McElvenny had entered into an agreement for manufacture and distribution with Snyder, Magers and Harry H. Hoppes then contacted Harold I. Snyder and learned that an agreement had been entered into with Zimmer for an exclusive license for distribution of Dr. McElvenny's device, trademarked "Hemovac."

In February, 1962, Magers left the employ of DePuy and in August, 1962, he, with his wife and Earl J. Simmons, his father-in-law, incorporated defendant Quest, Inc. (Quest). Defendant Quest manufactured and sold its surgical evacuator, the alleged patent infringer, under the name of "Bel-O-Pak."

Plaintiffs filed their complaint March 26, 1965, alleging in Count I, patent infringement, and in Count II, unfair competition, appropriation of trade secrets and confidential information, palming off and unjust enrichment. Defendants responded, denying all charges, alleging invalidity of the patent and denying enforceability by reason of misuse, and counterclaimed, filing a second counterclaim charging plaintiffs with violation of the Antitrust Laws of the United States and the State of Indiana. Extensive pre-trial interrogatories, depositions, affidavits and briefs were filed. Prior to trial, the district court granted defendant's motion for summary judgment on Count II of the complaint. Plaintiffs filed notice of waiver of appeal of this order.

Upon conclusion of the trial, the district court found plaintiffs' patent valid and infringed as to all claims 3–14; that the patent was enforceable against defendants; and that there had been no violation of the United States or Indiana State Antitrust Laws, and no patent misuse. The court further ordered a Writ of Perpetual Injunction to issue against the defendants twenty days after the issuance of the Judgment Order

and for an accounting to determine the extent of plaintiffs' damages caused by the manufacture and sale of the infringing devices.

Defendants on appeal allege numerous errors in the court's Findings of Fact and Conclusions of Law. The errors alleged fall into several categories: prior art, obviousness, failure of good faith disclosure, misuse of patent and antitrust violations.

The rapid healing of surgical wounds has long been a goal sought by surgeons. Restoration in the past has been improved through gravity draining of the fluids that collect in the vicinity of the wound after hermetic suturing. Prior to this early method, the body was required to resorb the effusions, which was a slow and unsatisfactory method, often causing the formation of fibrous tissue. As early as 1941, Iselin and Charton of France, discussed continuous suction and an article written on the topic by Anselme Schwartz in 1945. Numerous articles followed in the latter 1940's describing the advantages of negative pressure in holding skin flaps together and the insertion of multi-perforated catheters in the vicinity of the wound. This methodology eliminated bulky, and frequent changes of pressure dressings. Among the many contributors to the literature are the names of Murphy, Raffl, Redon, Lattimore, Cossie and Deban.

The paper delivered by Henri Redon in 1954 at the Académie de Chirugie in Paris, appears from the many references made to it the most influential in the infancy of closed-wound suction technique. Redon described accelerating coaptation through a preliminary effective cleaning stage of the wound, suturing, insertion of a tube in the wound area and establishment of a negative pressure through the use of a vacuumed transfusion bottle "transformed into a pneumatic machine." A recommended vacuum of 75 cm. of mercury was to be maintained, and a manometric pressure control was used to measure the vacuum. The beneficial results listed by Redon are short-

ened hospitalization, simplification of nursing, comfort to the patient and reduction of oedema and post-operative adhesions.

This surgical technique is now commonly used by surgeons; however, the method of providing the suction or negative pressure has varied. Compressed bulb syringes may in some cases be satisfactory but are not generally used. The vacuumed bottle, suggested by Redon has served well, but has the disadvantages of weight, loss of vacuum requiring regeneration through expensive mechanical equipment, and the use of a manometric gauge to determine vacuum. Central suction systems are used but are expensive to install and maintain. Individual power driven vacuum pumps may be used but they too are expensive, noisy and in the event oxygen for patient care is required, present a danger from electrically powered motors. Mobility of the patient is desirable as soon as possible, and none of the older methods of providing the negative pressure allowed the patient to be conveniently ambulatory.

Plaintiffs claim their device is completely self-contained, including all the parts necessary for insertion of the tubing through a needle screw-threaded to the tubing and readily connected to the Hemovac container. The container is resiliently compressible and expandable, establishing a continuous and sustained negative pressure or vacuum. It is unbreakable and sterile, light in weight and can be strapped to the patient allowing him to be ambulatory while still providing the essential vacuum.

### PRIOR ART

Defendants' primary allegations of error relate to the non-validity of the claims of the patent in suit over the prior art. Our attention is first directed to prior medical publications describing the technique of "closed-wound suction." Each of the exhibits cited describe surgeries of various portions of the body and the beneficial effect of post-operative closed-wound suction and the resultant accelerated and improved patient recovery. A review of the history of closed-wound suction leads us to the conclusion that the technique is indeed not new and novel.

Defendants assert that the claims in suit are drawn to a combination comprising the needle, perforated tubing inserted in the wound area and the connector tubing that is joined to the suction source.

It is elementary patent law that a regularly issued patent is presumed valid (although the failure to consider pertinent prior art can destroy this presumption) and the party alleging invalidity assumes the burden of establishing invalidity by clear and convincing evidence, 35 U.S.C. § 262; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977 (8th Cir. 1966). A combination of various elements already known to the art is patentable if it accomplishes either a new or an old result "in a more facile, economical and efficient way in a particular environment which presented peculiar and difficult problems." King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc., 354 F.2d 533 (10th Cir. 1965); Consolidated Electro. Corp. v. Midwestern Instruments, Inc., 260 F.2d 811 (10th Cir. 1958). There is no contention or claim in the patent in suit of the invention of the draining tubing inserted into the wound area, or the joining of a tube or tubes to the main tube to the suction source. Claims 3–14 describe a container, its method of construction, operation and effect; strap fastenings for attaching to the body of the patient; exhaust opening and valve stopper of the container; screw-threaded needle; an adjustable "Y" adapter for attaching more than one draining tubing to the patient; and a plurality of springs that exert an outward pressure on the container.

Defendant contends Sanders Patent 1,095,930 issued in 1914 disclosed a similar prior art container. Sanders is an embalming pump, perferably foot oper-

ated for quick operation, used to remove body fluids and to inject embalming fluids. The device consists of circular top and bottom plates of a heavy stable material joined together by a "flexible material" (preferably leather) and affixed to the plates by glue and screw bolts. Within the container is a spiral spring that expands the device after it has been contracted. Defendant argues that the Sanders pump with numerous changes would be identical to the patent in question. We agree Sanders is a pump, but the similarity disappears beyond that point. The changes suggested by defendants to the original Sanders would make it literally unidentifiable to Sanders himself. We disagree with defendants that the claims for the container would have been disallowed by the Patent Office Examiner had he known of the existence of the Sanders patent, and find it not to fall within the definition of prior art.

Defendant further relies on the Maloney article, defendants' exhibit as prior art. The article describes "Apposition and Drainage of Large Skin Flaps by Suction," and is a further development of this technique. However, the suction pressure recommended by Maloney is "either a bottle with a negative underwater seal or an electric or water pump" or "the use of a syringe of the Dakin variety * * *." The results from these methods of obtaining negative pressure have not been found as advantageous as the results obtained from the patent in issue.

The Tillotson Patent 2,122,121 issued in February, 1937, also relied on by defendants, described a suction drainage apparatus used in urologic surgery. The device is placed directly in contact with the body over the wound, and suction for its operation is obtained from "an electrically driven or other air pump, * * * or a running water aspirator of the type attachable to an ordinary water faucet." We fail to understand the comparison except that suction or negative pressure is used.

Prior art and prior surgical technique are not one and the same, and defendants appear to have consolidated the two into one in their arguments. Mindful of the criteria established in Consolidated Electro. Corp. v. Midwestern Instruments, *supra,* the combining of various known elements is patentable if it accomplishes a result "in a more facile, economical, and efficient way in a particular environment which presented a peculiar and difficult problem."

The court in O'Rourke Engineering Construction Co. v. McMullen, 160 F. 933, at 938, poses the following rhetorical questions: "Has the patentee added anything of value to the sum of human knowledge, has he made the world's work easier, cheaper and safer, would the return to the prior art be a retrogression?" Defendants state:

> [i]t is freely admitted that the availability of the "Hemovac" kit after September of 1960 greatly simplified the practice of the continuous closed-wound suction technique. Prior to the advent of such a kit, of course, it was necessary for the surgeon himself, or his staff, to collect, prior to surgery suitable tubing, connectors, a needle or other implement for producing a stab wound through which a portion of the catheter could be led, and an evacuated bottle, a rubber bulb syringe or other suction source; and in many instances to form additional perforations in the walls of that section of the catheter tube to be placed in the wound. Such perforations were time-consuming and introduced a risk of loss of sterility. Inconvenience, thus was a deterent to the universal use of the technique.

To this description we can only add that the patent in issue provided a new, novel and economical manner of providing a light, ambulatory source of continuous negative pressure to perform the fluid withdrawal component of the technique. In examining the prior art, the inescapable conclusion is that the patent not only contributed substantially to simplify the

technique but because of the efficiency and economical cost of the packaged device, removed a deterent to the expanded use of the technique.

We have considered each of the items raised by defendants relating to prior art and find no error committed by the trial court and affirm the findings of validity of patentability.

## OBVIOUSNESS

Defendants argue that the court committed error in its findings of validity for the reason that the subject matter as a whole was obvious to a person having ordinary skill in the art, long before 1959.

If the subject matter as a whole was obvious to a person having ordinary skill in the art, why did it take a period of sixteen years for the device to become available to the surgical field? "The failure of those working in the field to accomplish the results obtained by patentee is good evidence that the patentee's contribution constitutes patentable invention," Adler Enterprises, Inc. v. Carson, Pirie, Scott & Co., 218 F.Supp. 325 (N.D.Ill.1963), at 329; Schnell v. Allbright-Nell Co., 348 F.2d 444 (7th Cir. 1965).

Plastics, the main element from which the device is manufactured, has long been available to those skilled in the art but was not used for the purpose of providing the negative pressure source obtained from the patented device. Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F.2d 336 (7th Cir. 1966).

The simplicity of design and quality of performance were not obvious to those knowledgeable in the art since there was nothing comparable available to the medical field prior to the patent in issue. The obviousness of which defendant complains is true of many inventions after the patent is observed by one who is familiar with the art. Doc-

tors Hans von Leden, Charles A. Huboy and Joseph Bouta all testified to the efficiency, convenience and utilitarian characteristics of the "Hemovac," and its ability to be effective yet permitting the patent complete mobility. These ideal conditions are most desirable and were sought by the medical profession for many years, but were not available until the patented device was invented. We believe the court properly held the patent was not obvious to a person of ordinary skill in the art.

## GOOD FAITH DISCLOSURE

Defendant argues that patentees failed to disclose to the Patent Office the state of the prior art. It is contended that the needle for drawing the plastic tubing into the area is the same as in prior art and cites Dolge, defendants' exhibit 30–C. The Dolge embalming needle illustrates perforations for injection of fluids and a series of "annular inclined ribs" to "secure attachment for the flexible pipe connection." Plaintiffs' needle is of a hollow type, the blunt end of which was provided with "external threads" for screwing into the adjacent similarly threaded tubing and therefore, Dolge was not relevant prior art.

Defendants next contend that no reference was made by plaintiffs to prior art disclosing the "tube having a multiperforated section adapted to be disposed within a wound." Illustration Figure 7 and the description in the Patent, line 27, states "the tube is provided with apertures 31 having a diameter of approximately forty-thousandths of an inch * * *." Defendants cite certain defendants' exhibits as evidence of failure to inform the Patent Office of prior use of catheters, describing holes in the end section. Each of the exhibits describe drainage methods, some of which recommend perforating of the inserted end of the tube. Plaintiffs' patent describes the recommended size and loca-

tion of the perforations found suitable for its device. We restate that the technique of closed-wound suction was generally known and there is no attempted patenting of technique here involved. As to the other references relied on by defendants, we find they or their equivalent were considered by the Patent Office.

Therefore, we find no evidence of lack of candor or good faith on the part of the patentees and sustain the court's findings in this regard.

## ANTITRUST VIOLATIONS AND PATENT MISUSE

■ As to the alleged violations of Section 2 of the Sherman Act, defendant contends the court erred in its findings regarding the relevant market. The court found "the relevant market is not restricted to or limited only to portable surgical evacuators." From the evidence we find that devices in use prior to the "Hemovac" are still being used dependent upon the results sought by the surgeons and the availability of central suction systems, gravity drainage, syringes, Gomoco type electric pumps, Wagensteen water pressure systems and evacuated bottle types. We agree with the trial court that the relevant market includes all devices or products used to effect wound drainage. United States v. E. I. DuPont, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). There consequently is no evidence in the record to sustain defendants' contention that plaintiffs have a monopoly within this relevant market, and conclude no error was committed by the court in its related findings.

In addition, after a thorough reading of the record before us, we find no basis for any violations of either the State of Indiana or United States Antitrust Laws, nor do we find that any of the alleged antitrust violations resulted in patent misuse. We affirm the trial court's Findings of Fact and Conclusions of Law.

Affirmed.