**CANAAN PRODUCTS, INC., a Delaware corporation, Plaintiff,**

**v.**

**EDWARD DON & COMPANY, an Illinois corporation, John Sexton & Co., an Illinois corporation, American Hospital Supply Corporation, an Illinois corporation, and North Central Airlines, Inc., a Wisconsin corporation, Defendants.**

**Civ. A. No. 64 C 70.**

United States District Court
N. D. Illinois, E. D.

Dec. 30, 1966.

Merriam, Marshall, Shapiro & Klose, Charles J. Merriam, William A. Marshall, Alvin D. Shulman, Chicago, Ill., for plaintiff.

Raymond, Mayer, Jenner & Block, Jerold S. Solovy, Donald R. Harris, Chicago, Ill., for Edward Don & Co.

Anderson, Luedeka, Fitch, Even & Tabin, Edwin M. Luedeka, Robert B. Jones, Chicago, Ill., for John Sexton & Co.

Spray, Price, Hough & Cushman, Chicago, Ill., for American Hospital Supply Corp.

Harold L. Rutchick, St. Paul, Minn., for North Central Airlines, Inc.

FINDING OF FACT AND CONCLUSIONS OF LAW

PERRY, District Judge.

FINDINGS OF FACT

1. This is a patent infringement action brought by Canaan Products, Inc. (sometimes hereinafter referred to as "CANAAN") against Edward Don & Company, John Sexton & Co., American Hospital Supply Corporation, and North Central Airlines, Inc. (sometimes hereinafter referred to respectively as "DON," "SEXTON," "AMERICAN HOSPITAL," or "NORTH CENTRAL") for infringement of Williams United States Letters Patent No. 3,057,467.

2. Plaintiff is a Delaware corporation and is a wholly owned subsidiary of Colgate-Palmolive Company.

3. Defendant, Don, is an Illinois corporation with its main office in Chicago, Illinois; defendant, Sexton, is an Illinois corporation with its principal office and place of business in Chicago, Illinois; defendant, American Hospital, is an Illinois corporation with its principal office and place of business in Evanston, Illinois; and defendant, North Central, is a Wisconsin corporation, having a regularly established place of business at O'Hare International Airport in Chicago, Illinois.

4. The acts complained of as infringement occurred within the Northern District of Illinois, Eastern Division, as to each of the defendants (R. 43–8).

5. United States Letters Patent No. 3,057,467, the patent in suit, issued to Colgate-Palmolive Company on October 9, 1962 (PX–1). Colgate-Palmolive Company acquired the patent by mesne assignments from the inventor, Ross R. Williams (PX–1). The patent was assigned, of record, to plaintiff on December 12, 1963 (PX–25). The patent issued from a continuation application (PX–29) which was based upon an original application (PX–27) filed February 23, 1954.

6. The patent in suit covers a new and useful, pre-packaged moist towelette having three basic components: an envelope, an applicator and a liquid impregnating the applicator.

7. The applicator is typically made of a flexible sheet of paper large enough to serve as a washing and drying implement, free from any backing, and creped to impart a resiliency and a soft friction surface thereto. The applicator is folded longitudinally and transversely upon itself to provide a readily unfoldable, compact, multiple, substantially rectangular pad structure. The impregnated applicator has a sufficient wet strength to resist disintegration upon storage in the envelope over a long period of time and to resist tearing upon unfolding thereof just prior to use and during application of the liquid in use. A sheet having wet strength properties equivalent to paper having about 1.5–4% melamine resin added during the preparation of the sheet will have these properties.

8. The envelope is slightly larger in size than the folded applicator, and encases and protects the applicator and the impregnating liquid. The envelope is sealed and is made of a flexible, tearable metal foil lined with a film which seals upon the application of heat. The envelope may be opened by being torn and is substantially unaffected by and substantially impermeable to the impregnating liquid and the vapors thereof and has a strength to resist the vapor pressure of the impregnating liquid at normal atmospheric temperatures. The film lining the envelope is substantially unaffected by and substantially impermeable to the impregnating liquid and the vapors thereof.

9. A typical impregnating liquid comprises water and alcohol.

10. In use, the envelope is torn open, and the applicator is removed and unfolded. The unfolded applicator is used in a washing and drying operation to remove dirt and grime from the hands and face of the user. The dirt and grime removed during the washing and drying operation includes both soluble and insoluble forms of dirt. The applicator serves as both a washing and drying implement. The applicator initially applies liquid to the skin of the user. The liquid dissolves and/or entrains dirt from the skin, and the dirt-containing liquid is transferred to the applicator so that, in a moment, the same applicator serves as a drying implement removing surplus liquid from the skin. During the time the liquid is removed from the skin of the user, the applicator is still moist and is gradually drying out.

11. The inventor, Ross R. Williams, was met by apathy and antagonism from prospective large volume purchasers when he began to promote the invention of the patent in suit (Williams Dep. 53–4). He found a reluctance to believe that the American people would change their personal hygiene habits (Williams Dep. 54). He broke the barrier by buying an airline ticket on a Pan American flight to Bermuda, handing out packages to his fellow travelers and using their comments to convince Pan American Airlines which had theretofore been skeptical (R. 54–5). The need for such persistence is a clear indication of a lack of obviousness of the invention.

12. Plaintiff markets a product, known as "Wash 'n Dri," which is covered by the patent in suit. This product is selling at the rate of well over one hundred million packages per year (R. 126). The Wash 'n Dri product, while differing slightly from the specific example of the patent, in practice functions in the same manner and produces the same results in the same way (R. 500–1), and it was accepted by the Patent Office as a sample of the invention of the patent (PX–27, p. 57; PX–29, pp. 49, 51).

13. Advertising on this product by plaintiff and its predecessors has averaged about 20% of total sales (compare DX–82 with PX–29, p. 44), a relatively modest amount for the field in which it

competes (R. 126, 157). There was no evidence of any unusual promotion of any kind to obtain acceptance of the invention.

14. The accused infringing products are sold by defendants under such names as "Wash Up" (PX–71, 77), "Wet-Nap" (DX–70, 74, 80, 94), "Fresh-Nap" (PX–75, 81, 92–3) and "Tomac" (PX–72, 78, 79).

15. Each defendant marketed Wash 'n Dri moist towelettes for a period of time before marketing the accused infringing products (R. 45–6, 48); and each defendant subsequently switched to an accused product, the switch being made purely on price (Short Dep. 13, 44; Polovin Dep. 13, 15, 17; Holl Dep. 23; R. 887, 911). At no time did any defendant conduct any research or development of its own (Short Dep. 14, 45; Polovin Dep. 52; R. 940–2, 953–4, 956–7).

16. All of the accused products were made either by Nice-Pak Products, Inc. (R. 44–5; Julius Dep. 80) or by Lensclean, Inc. (R. 44, 46–47, 734–5, 951), now Holland-Rantos (Barnes Dep. 29). Both of these concerns copied the Wash 'n Dri product and rode on Wash 'n Dri's coat tails (Barnes Dep. 17–18; Julius Dep. 16–17, 26–7, 30–1). Both Lensclean, Inc. and Nice-Pak Products, Inc. were notified of the patent in suit, each in a letter dated October 12, 1962 (PX–60, 61).

17. Neither Lensclean, Inc. (or Holland-Rantos) nor Nice-Pak Products, Inc., has intervened in this suit. Lensclean, Inc., was originally named as a defendant but secured a dismissal. Don has admitted buying from Lensclean, Inc. (R. 47) and has admitted that it is neither paying for nor directing its defense in this suit (R. 890–1).

18. The uncontradicted testimony is that the specific example of the patent (PX–83), the moist towelette sold as Wash 'n Dri, and each of the accused products, all wash and dry the hands and face in the same manner, with substantially the same effectiveness (e. g., R. 500–2).

19. Don admitted that the moist towelettes of Nice-Pak and Lensclean and the Wash 'n Dri towelette were functionally equivalent (Polovin Dep. 13, 15, 16), and that they operated in the same way and that the use was the same (Polovin Dep. 53). Sexton admitted that there was no noticeable difference between Wet-Nap and Wash 'n Dri in removing grease from the fingers (Short Dep. 14), that the products of plaintiff, Nice-Pak and Lensclean in essence are the same, with the main difference being scent (Short Dep. 45), and that they are the same type of product (Short Dep. 54). American Hospital admitted that the Lensclean product and Wash 'n Dri are used in the same manner and are both the same (Holl Dep. 26), and that there is not enough difference in any of these products and they all seemed to be the same (Holl Dep. 34). Lensclean, Inc. and Holland-Rantos admitted that the Lensclean product was an imitation of Wash 'n Dri (Barnes Dep. 17–18).

20. Defendants made comparative tests of the Wash 'n Dri towelettes and the accused moist towelettes (R. 1196, 1279). Records were kept of these tests (R. 1280). After discussion with their expert, as to whether or not he would testify about these tests (R. 1280–1), they withheld this evidence from the Court. The legal presumption from such withholding is that the tests were unfavorable to the defendants. Neidhoefer v. Automobile Ins. Co. of Hartford, Conn., 182 F.2d 269, 271 (C.A.7, 1950) and Illinois cases cited therein. No evidence was presented to rebut this presumption.

21. The accused infringing products do not differ significantly from the patented product in the envelope, the sealing of the envelope, the applicator and the impregnating liquid. They all do the same task in the same manner. The following Table I shows each of the infringing items of each of the defendants and identifies the manufacturer of each

infringing item. The evidence of infringement, summarized on Table I, is overwhelming. The table is incorporated into this finding.

# TABLE I

## INFRINGEMENT BY DEFENDANTS

| Defendant | Infringing Product | | Manufacturer | | Evidence of Infringement | | |
|---|---|---|---|---|---|---|---|
| | Exhibit No. | Name Under Which Product Was Sold | Lensclean or Holland-Rantos | Nice-Pak | Envelope | Applicator | Impregnating Liquid |
| American Hospital Supply Corporation | PX–72 and 78 | Tomac Obstetrical towelette *(1) | R. 46 | | PX–41, PX–72, R. 424, 427, 431–2; PX–40, R. 671; PX–59, PX–78, R. 462–3, 465, 497–502 | PX–41, PX–72, R. 424–427, 430–2; PX–40, R. 671; Weinberger Dep. 83–84; PX–59, R. 497–502 | PX–42, R. 437–8; PX–40, R. 671 |
| | PX–79 | Tomac Antiseptic towelette (1) | R. 46 | | PX–40, R. 671; PX–59, PX–79, R. 462, 465, 497–502 | PX–40, R. 670–1; PX–17, R. 100–103, 111; Weinberger Dep. 83–4, PX–59, R. 497–502 | PX–42, R. 437–8; PX–43 |
| | | Tomac Wash Pack (1) | R. 46 | | PX–82, 86, Weinberger Dep. 84–6, R. 501–2, 638–9 | Weinberger Dep. 83–4; PX–82, 86, R. 501–2, 638–9 | PX–43; Weinberger Dep. 92–3 |
| | PX–95 | Tomac Wash Pack **(2) | R. 951 | | PX–95, R. 730–2 | PX–95, R. 730–2 | PX–95, R. 730–2 |
| Edward Don & Company | PX–81 | Fresh-Nap moist towelette (1) | R. 47 | | PX–59, PX–81, R. 462–3, 465, R. 470–2, 501–2; PX–92 | PX–18, R. 100–103; Weinberger Dep. 83–4; PX–59, PX–81, R. 462–3, 465, PX–81, R. 470–72; PX–92, PX–59, R. 501–2 | PX–45; Weinberger Dep. 90–3 |
| | PX–75 and 93 | Fresh-Nap moist towelette (2) | R. 734–5 | | PX–59, PX–75, R. 460–1, 497–502; PX–93, R. 734 | PX–59, PX–75, R. 460–1, 497–502; PX–93, R. 734 | DX–172; R. 1351, 1354 |
| | PX–92 (Polovin Dep. Ex. 2) | Fresh-Nap for hospital use (1) | R. 47 | | PX–92 | PX–18, R. 100–3, Weinberger Dep. 83–4, PX–92 | PX–45; Weinberger Dep. 90–93 |
| John Sexton & Company | PX–71 and 77 | Wash Up moist towelette (1) | R. 44 | | PX–41, PX–71, R. 421–3, 431; PX–59, PX–77, R. 462–5, 497–502 | PX–41, PX–71, R. 421–3, 429–32; PX–59, PX–77, R. 462–5, 497–502; Weinberger Dep. 83–4; PX–82, 86, R. 501–2, 638–9 | Weinberger Dep. 90–3 |
| | PX–70 and 80 | Wet-Nap moist towelette (1) | | R. 44–5. | PX–41, PX–70, R. 420–1, 431–2; PX–59, PX–80, R. 462–3, 465, 468–9, 501–2 | PX–41, PX–70, R. 420–1, 429–32; PX–59, PX–80, R. 462–3, 465, 501–2 | Julius Dep. 76, 80 |
| | PX–74 and 94 | Wet-Nap moist towelette (2) | | Julius Dep. 80 | PX–59, PX–74, R. 460–1, 497–502; PX–94, R. 733 | PX–59, PX–74, R. 460–1, 497–502; PX–94, R. 733 | DX–172 |
| North Central Airlines, Inc. | | | R. 43 | | Weinberger Dep. 81–2, 84–6, PX–82, 86, R. 415; PX–59, PX–71, R. 462–5, 472, 497–502; PX–41, PX–77, R. 421–3, 431 | Weinberger Dep. 81–2, 84–6, PX–82, 84, R. 415; PX–59, PX–71, R. 462–5, 472, 497–502; PX–41, PX–77, R. 421–3, 431 | Weinberger Dep. 81–2, 90–3 |

* "(1)" refers to product sold between issuance of patent in suit and filing of original complaint

** "(2)" refers to product sold between filing of original complaint and filing of supplemental complaint

22. The claims call for a cleansing agent and a volatile vehicle of water and alcohol. Water and alcohol are cleansing agents (R. 1268); and column 5, lines 50–54 of the patent in suit states that alcohol and water are contemplated as a cleansing agent:

"The impregnating liquid consists largely of volatile components, at least as volatile as water, such as alcohol diluted with water so that it initially serves to facilitate cleansing * * *."

23. The following statement, in the amendment which secured final allowance of the patent, reflects the understanding of both the applicant and the Patent Office of the term "cleansing agent" (PX–29, p. 51):

"In this connection it was agreed that the term 'cleansing agent' as used in the specification and claims is to be construed to embrace agents which are adapted to cleanse or assist in cleansing within the broad general meaning of the word 'cleanse,' viz., to free or rid of extraneous or undesired matter, including the concept of washing, sanitizing, disinfecting and the like."

24. The Nice-Pak product has both water and alcohol (Julius Dep. 76, 80; DX–172); and it cleans (R. 500). Alcohol and/or water are cleansing agents within the meaning of the claims.

25. Defendants, by contending that the invention will not both wash and dry, have insisted on a definition of the language of the claims which would exclude from the claims the single specific example of the patent. There is no basis for such a narrow and unrealistic interpretation of the claim language. It was proved, without challenge in Court, that both the accused products and the patented product will all wash the hands and then, almost instantly, remove from the hands (R. 450–67, 482–3, 497–501) sticky, greasy material which cannot be removed by a dry towel (R. 503–4) and, therefore, must be put into solution for removal. The removal of such dissolved material includes removal of the liquid in which the material is dissolved; and this is clearly a drying operation within the meaning of the patent, dry being a relative term (R. 1249).

26. The ads of plaintiff and of defendants' suppliers state: that the Wash 'n Dri towelettes "wipe away grime" (PX–14, 16); that the Wash-Up towelette of Lensclean constitutes "means of removing traces of food" (PX–2) and "removes all traces of the meal from hands and face" including "stickiness from icing on 'Danish' or chicken, etc." (PX–4); that the Nice-Pak towelette is "for removing make-up" (PX–10); and that the Wet-Nap towelette of Nice-Pak "removes all traces of sea food odor" (PX–11).

27. The removal of grime, stickiness from icing or chicken, make-up, sea food and other foods is not accomplished by evaporation of the liquid from the skin but by transfer of these things from the skin to the applicator along with the lotion in which they are dissolved or entrained (R. 15–16, 521–2). The ads are consistent with the description in the patent in suit of the function of the invention, viz., that the applicator removes liquid from the skin (see PX–1, col. 1, lines 51–53).

28. The uncontradicted testimony showed that after using the Wash 'n Dri towelette, the hands of the user were comparably as dry as after washing and drying in the usual manner with soap, water and towel (R. 520–22) and that the washing and drying characteristics of the accused towelettes and of the specific example of the patent were comparable to the Wash 'n Dri (R. 500–1).

29. The mechanism by which the moist towelette removes a solution containing dissolved sticky and greasy material from the hands and face while the towelette is still moist is not fully understood, and the inability to understand this mechanism conclusively proves the unobviousness of the development. The products of defendants and of the specific ex-

ample of the patent perform the above-described removal operation, and this has been established by uncontradicted evidence (e. g., R. 500–1). It is not necessary for an inventor to understand the mechanism or theory upon which the invention rests. Elgen Mfg. Corp. v. Grant Wilson, 285 F.2d 476, 479 (C.A.7, 1961).

30. The chocolate test, which was described to defendants in detail over eight months before the trial, dramatically and validly demonstrates the washing and drying feature of the products covered by the patent in suit.

31. The Wash 'n Dri moist towelettes were marked with the number of the patent in suit after its issuance, and for a time Don, Sexton and American Hospital sold plaintiff's moist towelettes with the patent marking on them (R. 329, 370, 910). Subsequently, all three switched to unlicensed moist towelettes which did not distinguish, in content or function, from the patented product.

32. Defendants allege mismarking of certain products made by plaintiff. There is no evidence that any patent marking was used by plaintiff with the intention of deceiving the public.

33. All patent markings applied by plaintiff were based upon the advice of counsel (R. 377). There was no mismarking and no misuse of the patent in suit because of the patent markings employed by plaintiff.

34. Before the trial, defendants gave notice of 37 separate prior art references upon which they relied in support of their position that the patent in suit was obvious. At the trial, they finally resorted to 16 references contained in the book of prior art submitted in evidence as Defendants' Exhibit 142. The fact that defendants find it necessary to rely upon such a large number of prior art references to contest the validity of an uncomplicated invention is a clear indication of the futility of the prior art. Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401, 404 (C.A. 7, 1950).

35. There has been no evidence that any one of the 37 references cited by defendants, or any combination of these references, would have operated in the same manner as the patented structure.

36. Defendants had their expert conduct tests on products which he made up and believed to be in accordance with prior art patents (R. 1282). Records were made of these tests (R. 1280). After discussing whether or not these tests should be included in the testimony of defendants' expert (R. 1280–1), the tests were withheld from evidence by defendants. The usual presumption, that this evidence would have been unfavorable to defendants, must be applied.

37. Among the art cited by defendants was Pickett, Patent No. 1,969,900. This patent, relating to an article intended for cleaning surfaces such as windows, was never put into use (PX–101, pp. 2–3); and the notes of Mr. Pickett show that, contrary to what he said in the patent, the use of his material on a window "left a smear" (PX–101, next to last page). There was no evidence to indicate that it would have been obvious to modify the Pickett structure to produce the patented structure. Pickett was referred to the Patent Office by Williams' attorney during the prosecution of the application (PX–27, p. 67).

38. The Wille patents (U. S. 1,993,469, German 616,885, French 747,708 and British 398,695) relate to a felt material so thick and strong as to be like leather (British 398,695, col. 1, fourth paragraph) and intended to replace a "brush, pumic stone and scrubbing sand" (U. S. 1,993,469, col. 2, lines 17–19). There is no evidence that the Wille structure was ever made commercially or physically useful. There is no suggestion in Wille that would make the patented structure obvious.

39. Although Wille U. S. Patent 1,993,469 was neither cited by the Patent Office nor brought to the attention of the Patent Office by plaintiff's predecessor, this patent is now listed by the U. S.

Patent Office in Class 15, Subclass 209 (PX–21, p. 3), and this was one of the classes searched by the Examiner before he allowed the patent in suit (PX–27, p. 47; PX–29, p. 35). There is no reason to believe that the Wille patent is not one of the patents studied by the Examiner in his search and discarded as being not relevant.

40. The teachings of Wille were available for twenty years before the Williams product came on the market. Yet, neither the defendants nor their suppliers have ever sold the product disclosed in Wille; and when the Williams product came out, defendants' suppliers copied Williams (Barnes Dep. 17–18), not Wille.

41. The Wille U. S. patent, uncovered by Williams' counsel, was not an anticipation. That no importance was attributed to it was shown by the fact that it was not called to the attention of the Patent Office whereas other prior art was (PX–27, pp. 67 and 69).

42. Patent 2,102,858 to Schlumbohm relates to a minute capsule of cotton wool, about the size of a lump of sugar (p. 2, col. 1, line 1), and packed in a sealed container. There is no evidence that a single Schlumbohm device was ever made. This patent was referred to the Patent Office by Williams' attorney during the prosecution of the patent in suit (PX–27, p. 67). There is no evidence that the Schlumbohm structure was physically useful.

43. The Schlumbohm, Salfisberg and Pickett patents were not cited by the Patent Office, but they were all called to the attention of the Patent Office by Williams' counsel (PX–27, pp. 67 and 69). The document in which these patents were called to the attention of the Patent Office was not formally entered, but before it could be denied entry, it had to be studied by the Patent Office to determine whether it met the requirements for entry. It was in the file and is a part of the file history.

44. Patent 2,112,963 to Jones is directed to a dry, perforated parchment paper washcloth which "does not absorb water" (col. 2, line 6). It was marketed for a while but was forced off the market by declining sales after Wash 'n Dri became commercially available (R. 1173–9). It has no relevance to the present invention.

45. Patent 2,232,783 to Hausheer describes a multiple packet with a cellophane lining and a moistened pad inside. This structure was never made. Hausheer claims to have sold about four million (R. 1109) aluminum packages (DX–108–108F) containing a flannel pad and cold cream, but these were withdrawn from the market in 1942 (R. 1115), and there was no subsequent demand (R. 1138). There is *no* evidence to indicate that this package would teach anyone to make the patented structure.

46. All of the remaining art cited by defendants is even less relevant than that specifically described in the preceding findings.

47. None of the "new" art here is any better than what was before the Patent Office.

48. None of the Waters patents under which Williams was licensed (DX–86) was cited by defendants as part of the prior art on which they rely (see DX–142). The Waters patents are irrelevant.

49. The moist towelette of the patent in suit has filled a long-felt want (DX–94A, p. 4), is composed of individual components long available, has had immediate adoption by the consuming public (DX–94A, p. 5), has had enormous commercial success (R. 126), has created an entirely new business (DX–94A, p. 4; Julius Dep. 15–17; Weinberger Dep. 9), and has been copied by competitors (Barnes Dep. 17–18). The invention covered by the claims of the patent in suit is a tribute to Williams' ingenuity and was not obvious.

50. Commercial success and the filling of a long-felt want guard against the temptation to read into the prior art the teachings of the invention in issue,

a temptation to which the defendants in this case have yielded. See Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F.2d 336 (C.A. 7, 1966).

51. With respect to each of the accused products, infringement is not avoided by any proceedings in the United States Patent Office during prosecution of the applications from which the patent in suit issued.

51a. There is no res judicata or estoppel by judgment against the claims of the patent in suit. The claims of the patent in suit originated in continuation application Serial No. 853,830 (PX-29) and were found by the Patent Office to be patentably distinct over Claims 36 and 38 of the parent application, Serial No. 411,815 (PX-27). The latter two claims were found unpatentable by the Patent Office Board of Appeals, and were the subject matter of a suit (PX-28) against the Commissioner of Patents which was subsequently dismissed.

52. The continuation application (PX-29) contained no new matter over the original application (PX-27). The one specific example in the continuation application (PX-29, p. 11) is identical to the one specific example in the parent application (PX-27, p. 13). Whatever differences there were between the continuation application and the original application were merely explanatory of the function inherent in the one example which was common to both, and did not amount to new matter. This same decision was reached by the experts in the United States Patent Office, since the second application (PX-29) was permitted to issue as a continuation application.

53. The invention of the patent in suit was neither in public use nor on sale more than one year before the filing of the parent application (Williams' Dep. 53-55).

54. The invention of the claims of the patent in suit was disclosed in the parent application (PX-27, pp. 1-14) and was carried forward into the second application (PX-29, pp. 1-12). The filing date of the parent application is the priority date for the subject matter recited in the claims of the patent in suit.

55. The claims of the patent in suit particularly point out and distinctly claim the subject matter of Williams' invention. The claims are not indefinite.

56. The specification of the patent in suit discloses a practicable way in which to make the product of the claims, and this disclosure was followed in making up PX-83 (R. 474-82).

57. The detailed description and the claims of the patent in suit conform to all the requirements of the patent statutes of the United States and of the Rules of Practice of the United States Patent Office.

58. The patent in suit has never been litigated before. The record shows previous litigation with Pacquettes involving other subject matter, but this was settled (DX-63).

59. The language "may have" used in connection with patent rights of R. R. Williams, Inc. in paragraph 7 of the stipulation of February 27, 1957 (DX-63) between R. R. Williams, Inc., and Pacquettes, Inc., settling litigation between them, is conventional language used when one of the parties does not wish to admit that the other party has any rights, be they patent rights or other rights. It was not the intent of the parties for said stipulation to confer upon Pacquettes, Inc., any license under patents which the Williams company or its successors might subsequently obtain

60. There is no indication that defendants have done any advertising of their own, and there is no indication of any substantial amount of advertising by their suppliers (Weinberger Dep. 70-1), all having chosen to ride the coat tails of plaintiff. The evidence does not disclose any patent investigation by defendants or, in fact, any investigation other than as to price (Short Dep. 13,

44; Polovin Dep. 13, 15, 17; Holl Dep. 23; R. 887, 911).

61. Defendants have alleged a conspiracy between Colgate and plaintiff to unlawfully restrain trade or to extend the patent monopoly, but have not joined Colgate as a party.

62. There is no evidence of unlawful restraint of trade, nor of extension of the patent monopoly, nor of attempt to do these things, nor of illegal conspiracy.

63. This suit was not brought to eliminate defendants or defendants' suppliers as competitors. Defendants' suppliers have been offered licenses (see PX-60-1), and defendants were sought and are still being sought as customers of plaintiff. Under their licenses, customer licensees are free to purchase from unlicensed manufacturers including defendants' present suppliers (DX-176A).

64. During the prosecution of the applications from which the patent in suit issued, there were neither misrepresentations to the Patent Office nor concealment from the Patent Office of information which should have been disclosed.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter and has venue of this action.

2. By assignment, the ownership of the patent in suit was duly and legally transferred from Colgate-Palmolive Company to plaintiff herein.

3. Where prior art patents called to the attention of the Patent Office are not cited, it cannot be assumed that the Patent Office did not consider these patents. It is just as reasonable to conclude that they were considered and cast aside as not pertinent. Anderson Co. v. Sears, Roebuck and Co., 265 F.2d 755, 761 (C.A. 7, 1959); Adler Sign Letter Co. v. Wagner Sign Service, 112 F.2d 264, 267 (C.A. 7, 1940).

4. Where the prior art known to the patentee did not anticipate, there was no obligation to call this prior art to the attention of the Patent Office. RPTZ-Patco., Inc. v. Pacific Inland Navigation Co., 253 F.Supp. 796, 799 (D. Ore., 1966); Wen Products, Inc. v. Portable Electric Tools, Inc., 367 F.2d 764 (C.A. 7, 1966); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 879-880 (C.A. 7, 1966).

5. Where the new art cited by defendants is no better than the art cited by the Patent Office, the usual presumption of validity is strengthened. Schnell v. Allbright-Nell Co., 348 F.2d 444, 448 (C.A. 7, 1965); Otto v. Koppers Co., 246 F.2d 789, 801 (C.A. 4, 1957); Bissell Inc. v. E. R. Wagner Mfg. Co., 204 F.Supp. 801, 811 (E.D.Wisc., 1962); Bowser Inc. v. Richmond Eng. Co., 166 F.Supp. 68, 75 (E.D.Va., 1958).

6. The invention defined by Claims 1 and 2 of the patent in suit was not obvious to those skilled in the art at the time the invention was made; and both of these claims are good and valid in law.

7. When the specification of a patent discloses a practicable way in which to make the product of the claims, the claims are not indefinite. National Theatre Supply Co. v. Da-Lite Screen Co., 86 F.2d 454, 455 (C.A. 7, 1936).

8. One who alleges an antitrust conspiracy other than price fixing must plead relevant market and show control of that relevant market. Walker Process Equip., Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

9. There has been no misuse of the patent in suit.

10. The patent in suit is valid and enforceable.

11. Although it is unnecessary to rely upon commercial success to find the patent in suit valid, the commercial success of the invention covered by the patent in suit adds strength to its validity. Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 672 (N.D.Ill., 1961).

12. The fact that the claims call for both a cleansing agent and a volatile vehicle of water and alcohol does not exempt the Nice-Pak product. One

does not escape infringement by providing a single element which fully responds to a plurality of elements in the patent. Sears, Roebuck & Co. v. Delta Mfg. Co., 78 F.2d 745, 747 (C.A. 7, 1935); Simplex Appliance Co. v. Star Can Opener Co., 37 F.2d 491, 492 (C.A. 7, 1930).

13. Infringement of allowed claims is never avoided merely because a defendant would also have infringed claims that were dropped. Ceramic Process Co. v. General Porcelain Enameling & Mfg. Co., 129 F.2d 803, 806 (C.A. 7, 1942).

14. Both Claims 1 and 2 of the patent in suit are infringed by each of the products listed in Table I incorporated in Finding of Fact 21; and each of the defendants has been and is guilty of infringement of both of the claims of the patent in suit.

15. Defendants American Hospital Supply Corporation, Edward Don & Company and John Sexton & Co., having marketed the patented product of plaintiff at a time when the product was marked with the number of the patent in suit, and then having switched to unlicensed copies of the patented product, are, under the circumstances surrounding the switch, estopped to deny infringement. See Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co., 44 F.Supp. 401, 402 (S.D.N.Y., 1941); Lathrop v. Rice & Adams Corp'n., 17 F. Supp. 622, 624–626 (W.D.N.Y.1936).

16. Nice-Pak Products, Inc. acquired no license under the patent in suit as a result of the stipulation between R. R. Williams, Inc. and Pacquettes, Inc. dated February 27, 1957 (DX–63).

17. In order to establish mismarking, it must be shown that the patent marking was used with the intent to deceive the public. 35 U.S.C. § 292.

18. Mismarking is not a defense to patent infringement, Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347, 349–351 (C.A. 9, 1963); and there was no mismarking, by plaintiff, in violation of 35 U.S.C. § 292.