**TECHNITROL, INC., Plaintiff,**

v.

**ALADDIN INDUSTRIES, INC.,
Defendant.**

**No. 67 C 2067.**

United States District Court,
N. D. Illinois, E. D.

April 27, 1970.

---

1. This is the only issue remaining with respect to the first two counts of plaintiffs' complaint.

---

M. Hudson Rathburn, Mason, Koleh-mainen, Rathburn & Wyss, Chicago, Ill., S. C. Yuter, Paul Fields, Yuter & Fields, New York City, of counsel, for plaintiff.

Dugald S. McDougall, Theodore R. Scott, David L. Ladd, and Melvin M. Goldenberg, McDougall, Hersh, Scott & Ladd, Chicago Ill., for defendant.

## DECISION ON THE MERITS

ROBSON, Chief Judge.

This is a patent suit brought by Technitrol, Inc. (Technitrol), a Pennsylvania corporation, against Aladdin Industries, Inc. (Aladdin), a Delaware corporation, having a regular and estab-lished place of business in Illinois, for infringement of United States Letters Patent No. 3,155,766, issued to Technitrol November 3, 1964. Plaintiff's suit is directed only to claims 1–4 and 6–9 of the patent, which concerns an electrical component assemblage, and defendant in turn has counterclaimed for a declaratory judgment that the claims are invalid and have not been infringed. The court has jurisdiction, and it is stipulated that defendant received actual notice of alleged infringement from the plaintiff on or about March 24, 1967.

Defendant's defense is invalidity. It alleges that the assemblage (claims 8 and 9) is an unpatentable aggregation of old elements which perform no new and useful function. It further argues that all claims are invalid because certain prior art, unreferenced by the examiner, was a prior use or sale of substantially the same device more than one year prior to the patent application under 35 U.S.C. § 102(b) and that in light of the pertinent prior art the patented device was obvious to one ordinarily skilled in the art under 35 U.S.C. § 103. Plaintiff urges that its assemblage produces a new and useful function, that the devices relied on by the defendant are not prior art, and that its device was not obvious from the prior art as shown by secondary tests of obviousness such as long felt need, commercial success, and commercial acquiescence.

After a trial on the merits and careful consideration of the patent, the prior art, the testimony and exhibits, and the briefs, this court holds that claims 1–4 and 6–9 of the patent are invalid.

### The Patent

Plaintiff's patent (hereinafter the Eichert Patent) was first applied for on February 13, 1961, by Edwin S. Eichert, Robert F. Proctor, and Julius Polsky, each of whom was employed by Technitrol at the time. It was later assigned to Technitrol which is now the sole legal owner of said patent. The Eichert Patent covers a "T" shaped electrical component assemblage for mounting on ter-

minal or printed circuit boards. Though not so limited, it particularly covers a pulse transformer of miniature or subminiature size. Claims 1–4, 6, and 7 relate to the casing which in the words of claim 1 is:

"A casing for fully enclosing an electrical component having leads comprising a component receptacle composed of an insulating material and constructed as a unitary molded structure having a plurality of members that are integral with one another, said members including a base member [*i. e.*, the bottom of the "T"] and a superposed member [*i. e.*, the top of the "T"] atop said base member having an aperture located above said base member which, with said base member, forms a socket adapted to receive and support the component, said superposed member having a part extending laterally outwardly of an outer edge of said base member, said casing further comprising a plurality of flexible electrical leads that are fixedly embedded in said unitary molded structure and are spaced from one another and pass through said outwardly extending part generally in the vertical direction in inwardly spaced relation to an outer edge of said superposed member and outwardly spaced relation to an outer edge of said base member, each lead of said plurality of flexible electrical leads having its intermediate portion fixedly embedded in said outwardly extending part with the top end portion extending upwardly of the upper surface of said outwardly extending part and the bottom end portion extending downwardly of the lower surface of said outwardly extending part, said plurality of flexible electrical leads being adapted to connect to the leads of an electrical component supported within said socket."

Claims 2, 3, 4, 6, and 7, relate to the following specific features of the case: the extension of the electrical leads past the lower surface of the base member (claim 2); the length of the leads sufficient to extend past the outer edge of the superposed member so as to connect to external circuits (claims 3, 6, 7), and the flange-like rim member of the superposed member (claim 4). Claims 8 and 9 relate to the entire assemblage, *i. e.*, the casing previously described with an electrical component, the transformer, supported in the socket of the case and connected to the upper part of the electrical leads. The stated objects of the patent are to provide an improved pulse transformer mounting assemblage for terminal boards which is simple and inexpensive to manufacture and to mount and which permits the removal of excess solder flux after mounting so as to avoid the possibility of electrical malfunction.

### History of the Patented Device and Accused Infringer

Since 1954, when printed circuit boards came into general use in computers and other advanced machines, there has been an ever-growing market for miniaturized electrical components. One such component is the pulse transformer which is a device employed to couple electrical energy from one electrical circuit to another and which consists of a magnetic core with windings of material around it. Due to the delicate nature of the windings, the transformer is placed in a case with its fine wires attached to firmer electrical leads in the case which connect the transformer to the printed circuits. These assemblages are miniaturized because the boards are small and because many small boards are placed together to make up panels on a "mother board."

Plaintiff began developing its patented transformer assemblage, which is called the Genie, during the summer of 1960. At that time Technitrol manufactured many small pulse transformers in many different cases depending on customer specifications. There were two main types—the axial leaded type and the printed circuit type, the main difference being the way in which the electrical leads extend from the case. In the early printed circuit transformers, short,

rather rigid leads which were attached to the encased component extended from the bottom of the case to fit into holes drilled in the printed circuit board. The leads would be soldered from the underside of the board by a dip-soldering method. Often this would result in solder flux, a material used in the dip-soldering method to clean the circuits to create a better connection, seeping through the holes and becoming lodged under the transformer, which always left slight gaps between itself and the board. Solvents were used to cut the solder flux from the boards, but flux trapped under the transformer would often remain. If it seeped into the casing itself, which in early models was not airtight, a malfunction of the unit could result.

The axial leaded transformer has electrical leads which extend laterally from the casing and which are attached to turret lugs placed vertically in the board. They could also be bent down to fit into printed circuit holes.

The Genie, which was first produced in quantity in 1961, enable Technitrol to mount a pulse transformer in both the printed circuit mode and the axial lead mold at the same time. In the words of Edwin S. Eichert, the chief developer, it was a "good product." It cost approximately 50% less to manufacture than earlier Technitrol assemblages, but this was due in part to a change in the transformer component which was unrelated to the present patent. In addition, with little advertising, the Genie transformer approximately doubled its sales volume each year between 1961 and 1966 from 100,000 units in 1961 to 2,000,000 units in 1966. During this period, however, the Genie (in several case sizes) made up a constant 50% of Technitrol's entire transformer sales since this was a boom period in the industry and since Technitrol continued to market its other transformers whose sales also increased. During 1967 and 1968, the Genie lost sales volume due to increased competition from other manufacturers and to a downtrend in the industry.

Aladdin's involvement with a "T" shaped pulse transformer, which it calls the Micro-T, began in the summer of 1962 when General Electric Company, an early customer of Technitrol's Genie, sought a second source of supply for the "T" shaped transformer. General Electric sent a specification control drawing to Aladdin requesting that it make a miniature "T" shaped transformer and indicating that the original source of supply was Technitrol. Aladdin acted upon this request and created a transformer substantially similar to the Genie. The only differences from the patented device are (1) that the leads of the Aladdin model are not molded into the case as the patent teaches, but are fixedly imbedded by an epoxy later in the manufacturing process, and (2) that the socket containing the transformer does not have thickened walls in which the leads are imbedded. Aladdin refused to take a license from Technitrol after notice of alleged infringement of the Eichert Patent.

There are fifteen or twenty major manufacturers in the industry. Of these at least eight have begun producing similar "T" shaped transformers. Technitrol has served notice of infringement on three companies—Sprague Electronics, Pulse Engineering, and Contemporary Electronics—and five other companies—PCA Electronics, Zeltex, Valor Electronics, Gulton Electronics, and Tokin (Japan)—are now offering "T" shaped transformers in their catalogues. None have accepted a license from Technitrol.

### The Prior Art

It is undisputed that the transformer itself used in plaintiff's assemblage is an old element that was in general use before the patent application. It is also clear that the manufacturing techniques and materials used to manufacture the assemblage—the resins for the case, flexible wire for the leads, and potting

compound to fill up the case—were also available prior to the Genie development. Prior patent applications referenced by the examiner taught the concept of cases molded as a unitary structure from electrical insulating material (Firth Patent No. 2,695,856; Gellert Patent No. 3,046,452; Van Dillen Patent No. 3,054,024; Schlegel Patent No. 3,061,762) and the concept of a universal mounting transformer, i. e., one that could be mounted in both the printed circuit and axial lead molds at the same time (Schlegel Patent No. 3,061,762).

Defendant relies on two unpatented prior art devices, the Triad Red Spec transformer and the Autonetics transformer, and one prior art patent, the Jensen Patent No. 2,976,465, none of which was referenced by the examiner. Plaintiff argues that none are pertinent prior art.

The Triad Red Spec is a miniature rectangular transformer molded as a unitary structure having long, flexible leads and a small .020 inch protrusion or step in the base which was developed during the summer of 1959 by Triad Transformer Corp., a division of Litton Industries. The casing was purchased separately from a California corporation, Rheinhold Geiger, and the assemblage molded at Triad's plant.

The Red Spec was originally conceived without the step in the base, but only one drawing and an early catalogue prepared for a May, 1959, parts show portray it without the step. Triad witnesses stated that it was never manufactured without the .020 step. On the basis of the extent records and the testimony of witnesses, which this court finds very credible despite Technitrol's arguments to the contrary, it is apparent that the Red Spec with the small step existed at least as early as September 24, 1959, and that small quantities of such transformers were sold to Triad distributors prior to February 13, 1960, over one year prior to the Eichert Patent application.

The purposes of the .020 step in the base as testified to by Triad witnesses were to provide a space between the transformer body and the board that would permit easy inspection of leads, cleaning of the board, removal of the transformer where necessary, and an axial leaded configuration for external circuits. Plaintiff's expert testified that the .020 space was too small given the dimensions of the leads to permit an axial leaded mold. From the sample submitted to the court, it appears that the leads may be bent laterally although this may cause a breakage of the leads so bent. On the basis of all the foregoing, this court finds that the Triad Red Spec was clearly pertinent prior art which should have been referenced by the examiner.

The Autonetics transformer was developed in small quantities during 1958 by the Autonetics Division of North American Aviation Company for use in a classified aircraft produced for the United States Government by North American. The cases, in two separate sizes, were "T" shaped and were purchased from Nyglass, Inc. of California and later from Rheinhold Geiger on the basis of specifications furnished by Autonetics. The transformer assemblage was produced by Autonetics and was a unitary molded structure of comparatively large size having short rigid leads which could not be bent or laterally extended. Had flexible leads been provided, however, the "T" shape would easily have permitted axial leaded configuration. It was developed in the "T" shaped design, however for an entirely different purpose—to fit through a circuit board so that it might be bolted on to a metal chassis beneath the board.

The cases manufactured by Nyglass and Rheinhold Geiger were not classified. The production of the transformer assemblage was not restricted aside from usual plant security, and title to the transformer passed to the United States after production. The ultimate use of the transformer was restricted, however, since it was a part of a classified aircraft, and none were ever sold or offered to the general public.

■ Defendant argues that since the cases were purchased without restriction and since the manufacturing process was unrestricted, the Autonetics transformer, which is otherwise clearly pertinent, was accessible to the public and therefore a prior use or sale and prior art. It is undisputed, however, that the transformer was *used* in a restricted project and that it was *sold* under a single restricted contract. As such, this court holds that the Autonetics transformer was not accessible to the public and was a secret use. Carboline Co. v. Mobil Oil Corp., 301 F.Supp. 141, 148 (N.D.Ill.1969); Minneapolis-Honeywell Reg. Co. v. Midwestern Inst., Inc., 298 F.2d 36, 38 (7th Cir. 1961). Thus the transformer may not be considered pertinent prior art or a public use or sale under the patent laws.

The Jensen Patent was applied for December 17, 1959, and issued March 21, 1961. It describes a semiconductor device which consists of a conducting, solid metal base member holding the component (a transistor) with a cover member over the base sealed around a protruding rim. The base has cavities through which electrical leads extend laterally and are bent upwards and widened into terminal points. The leads appear to be rigid rather than flexible since they pass through glass beads set in the walls of the cavities. A cross section of the base through the cavities gives the base a "T" shape.

■ Defendant argues that this patent is prior art concerning flexible leads and an axial lead configuration. The court is of the opinion, however, that the Jensen device is substantially different from the Eichert Patent and not as pertinent as other patents referenced by the examiner. In such circumstances, the fact that it was unreferenced does not necessarily mean that the examiner failed to consider it. Canaan Products, Inc. v. Edward Don & Co., 273 F.Supp. 492, 501 (N.D.Ill.1966), aff'd, 388 F.2d 540 (7th Cir. 1968). It is more likely here that he considered it not pertinent.

The court holds therefore that the Jensen Patent is not pertinent prior art.

## Invalidity of the Patent

■ It is clear that the statutory presumption of patent validity does not exist as against evidence of pertinent prior art not before the patent office and that one prior art reference is sufficient to overturn the presumption. T. P. Laboratories, Inc. v. Huge, 371 F.2d 231, 234 (7th Cir. 1966). This court has found that the Triad Red Spec transformer is such prior art and further finds that in light of the Red Spec the Eichert Patent was reasonably obvious to one ordinarily skilled in the art under 35 U.S.C. § 103.

The Red Spec embodies or anticipates all the claimed improvements of the Eichert Patent. The only relevant differences between them are in the height of the bases and in the absence of a walled socket for the transformer in the Red Spec. The Red Spec clearly teaches that a step in the base will permit the removal of solder flux from beneath the leads. It also teaches the advantage of using long, flexible leads and of protecting the transformer by using a unitary molded body. Plaintiff's own witness testified that raising the step of the Red Spec so that the leads might easily be put into an axial mold would be obvious. The differences between the Red Spec and the Eichert Patent therefore are clearly not sufficient to save the latter's validity.

■ Plaintiff argues that its patent meets all the secondary tests of non-obviousness as approved in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965), and that this requires a finding that its device was non-obvious from the prior art. It relies specifically on tests of long felt need, commercial success, lack of a simultaneous solution, commercial acquiescence, and professional approval. *See Note,* Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169 (1964). This

court is of the opinion, however, that application of those subtests reinforces the court's finding of obviousness. There has been little or no commercial acquiescence—at least eight other major manufacturers are marketing similar "T" shaped pulse transformers. The Triad Red Spec negates the test of lack of a simultaneous solution. The commercial success of the Genie, detailed in this opinion was due in part to the general boom in the industry, and the "T" shaped cases share the market with prior cases which have not been supplanted by it. There may have been a need for an improved transformer assemblage because of practical problems encountered in mounting transformers on printed circuit boards, but the Red Spec solved or anticipated the solutions to those problems. In any event, the two factors of long felt need and commercial success without invention will not make patentability. Anderson's–Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); T. P. Laboratories, Inc. v. Huge, *supra*, 371 F.2d at 236.

In light of this ruling, the court declines to consider defendant's further argument that the Triad Red Spec was a prior use or sale of the invention within the meaning of 35 U.S.C. § 102(b). This is but a variation of the argument concerning obviousness under 35 U.S.C. § 103 since the inventor is not alleged to have made the prior use and since a prior art device is the alleged prior use.

The court further finds that claims 8 and 9 relating to the entire assemblage are invalid on the separate ground that the transformer performs no new and useful function in the combination. In Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549–550, 58 S.Ct. 662, 82 L.Ed. 1008 (1938), the Supreme Court stated the test:

> " * * * The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention. And the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination."

*See also* Anderson's–Black Rock, Inc. v. Pavement Salvage Co., Inc., *supra.*

Assuming that the case is an improvement over prior cases, the plaintiff has no right to claim the entire assemblage unless the transformer (or any other component that would be used in the case) contributes a new or useful function to the combination. It is undisputed that the transformer itself (or other component) performs no different function in the "T" shaped case than it performs in previous cases. Nor is any new or useful function for the transformer claimed in the patent. Plaintiff argues that a new function is that the fragile wires of the component are protected from breakage and from the environment by the novel casing and are electrically connectable to an external circuit with the combination resulting in 50% cost saving over the previous case and transformer taken separately. This properly seems a function of the casing rather than the transformer, and in any event it is an apparent afterthought since it is not a stated object of the patent. Claims 8 and 9 are therefore invalid for claiming an unpatentable aggregation.

### ORDERS

█ It is ordered therefore that claims 1–4 and 6–9 of the Eichert Patent be, and they are hereby, declared invalid.

It is further ordered that defendant revise its findings of fact and conclusions of law to conform with this opinion within 10 days.