PLASSER AMERICAN CORPORATION, Plaintiff,

v.

CANRON, INC., d/b/a Tamper, Defendant.

Civ. A. No. 75–1932–5.

United States District Court, D. South Carolina.

April 23, 1980.

**592**

John Gregg McMaster, Tompkins, McMaster & Thomas, Columbia, S.C., Alfred H. Plyer, Jr., Kinzer, Plyer, Dorn & McEachran, Chicago, Ill., for plaintiff.

Charles W. Knowlton, Boyd, Knowlton, Tate & Finlay, Columbia, S.C., Robert E. Clemency, Michael, Best & Friedrich, Milwaukee, Wis., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HEMPHILL, District Judge.

This patent infringement action is lodged pursuant to the patent laws of the United States, and is before this court on the jurisdictional basis of Title 28, Section 1338(a).[1] Plaintiff filed the Complaint on July 30, 1975, seeking a permanent injunction against Defendant's alleged infringement of two of Plaintiff's patents, an accounting for damages from same, treble damages, and costs. Defendant has denied the allegations and seeks costs and attorneys' fees on grounds that Plaintiff's patents should be declared invalid and noninfringed. Trial in this matter was preceded by years of discovery and motions, but the case finally came before this court for a nonjury trial on June 18, 1979. The trial lasted one week, and the parties were asked, in lieu of final argument, to present proposed findings and conclusions to this court prior to oral argument. Oral arguments on this matter were held in Rock Hill February 5, 1980, and two demonstrations of commercial machines manufactured by the parties were held for the benefit of this court. The matter is now ripe for decision, and this court will consider, first, the validity of Plasser patents, and second, if necessary, whether they have been infringed. Damages need not be determined at this time as the court bifurcated the damages issue from that of liability. Accordingly, after hearing the testimony, reviewing the file, and considering the entire record, upon the credible evidence before it, this court publishes its findings of fact and conclusions of law.

### BACKGROUND FACTS

Plaintiff, Plasser American Corporation (Plasser) is a Delaware corporation[2] which is related by common ownership to one or more Austrian companies, all of which carry the name 'Plasser' (Plasser-Austria). Defendant, Canron, Inc. (Canron), is a New York corporation having a regular and established place of business in West Columbia, South Carolina.

Plasser is the owner of the two patents in suit which concern mobile track maintenance equipment which are capable of correcting railroad track by vertically leveling it to the desired height and horizontally aligning it to the desired positions. The first patent, No. 3,425,360, entitled, "Mobile Track Correcting Machine" was issued in

---

1. Title 28, § 1338(a) reads:

    The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

2. The principal place of business of Plasser is Chesapeake, Virginia.

the United States on February 4, 1969 after being filed on January 12, 1966, and is based upon two Austrian priority applications.[3] The second U.S. patent, No. 3,494,-297, is called a "Mobile Track Maintenance Machine" and was issued on February 10, 1970. It was originally filed in the United States on October 18, 1965 and is based upon three Austrian priority applications.[4] The accused machines are known as Canron's "Torsion Beam Machine", first offered for sale in the United States in the fall of 1974, and the Mark III Machine which was first manufactured and/or offered for sale in the United States in March, 1977.

Plasser and Canron are world-wide competitors in railroad track maintenance equipment. Maintenance of the roadbeds in the U.S. has been sadly neglected in recent years and a great deal of money is being put into upgrading the quality of roadbed maintenance and the "accuracy" of the track. The parties are competitors in providing fast, efficient, fully automated maintenance equipment.

Normally railroad track gets out of line, both in a vertical and horizontal plane, due to traffic moving over it (Tr. 32, Ex. 153). Periodically the track must be corrected and brought back into proper vertical and horizontal alignment, otherwise the speed of moving traffic has to be reduced, which causes an increase in freight rates, etc. (Tr. 46–48). Plasser and Canron, among others, have been active in the development of new technology in this field for the last 25 years or so.

The subject matter of this controversy is concerned with railroad maintenance equipment, known as "Tampers", which force the "ballast" (stones) under the ties so that the ties, and therefore the track, will be fully supported (Tr. 30–34, Exs. 153, 154A). During the years of the early and mid-1960s, tampers had been automated to a point that they included devices for automatically leveling or grading the track in a vertical

direction to bring the rails up to an accurate level (Tr. 38, Ex. 157). During these years it was conventional to follow the tamper with a separate aligning device which was constructed to correct deviations and curves of a horizontal nature in the track. The standard of reference for correcting the track was a horizontal reference line, usually an elongated wire extending down the track from the machine and connected at each end to buggies which control the track-moving device (Exs. 158, 159). At each deviation the track was brought back to a precise accurate relationship relative to the reference line. These track moving machines used one or more ballast-engaging shoes with spikes on the bottom thereof to dig down into the ballast for support, at which time a lateral thrust[5] was applied against one rail or the other, by its cylinder that extended from the ballast-engaging shoe against the rail so that the aligning reaction was taken by the ballast through the shoe. This ballast-engaging shoe was referred to at trial as a "ballast anchor" (Ex. 158).

However, there were problems with this approach of having one machine follow another. The difficulty was that the aligning machine following behind tended to spoil the accurate level that the tamper ahead of it had just applied to the rails (or vice versa) (Tr. 46–48). If both the raising and aligning could be done at the same time, and the ties fixed while the rails were held in accurate position, both vertically and horizontally, the fixed position would be much more accurate than when the two operations were done separately. Also of benefit would be the savings in manpower and time of having one machine replace two. Furthermore, a primary objective was to produce work that was permanent, the theory being that once the track was fixed in a permanent position, its accuracy would last longer (Tr. 46, 47). The desirability of cre-

---

**3.** The first application being filed January 18, 1965 in AUSTRIA.

**4.** The first Austrian application being filed on December 31, 1964.

**5.** A thrust moving the track in the horizontal direction, either right or left (Tr. 324–325).

ating one machine to do this was apparent, but how to do it was another matter. In the 1960–64 period the inventor of the '360 and '297 patents in suit, Mr. Theurer, made several unsuccessful attempts to develop a combined machine to solve the problem (Tr. 50–58). In Theurer's first attempt he attached a frame to the rear of the standard leveling tamper. On this frame he placed tools which extended on each side of the track and were inserted into the ballast opposite the ends of the ties. The ballast was then compacted against the end of the ties to force the ties and the track sideways, while the reaction of the aligning force was taken by a ballast-engaging shoe positioned between the ties and rails (Exs. 21, 74, 98, 99, 160, Tr. 50–52). This first attempt was not successful because the aligning force was taken by the ballast through the ballast-engaging shoe. The shoe did not properly or adequately absorb the aligning force (Tr. 52).

On his second attempt, Theurer cantilevered the tools of the first attempt on a girder from the rear end of the leveling tamper so that a ballast shoe was not used (Tr. 53, Ex. 161). However, because the tools engaged the ballast instead of the rails, and because the cantilevered arrangement tended to twist or skew the frame of the leveling tamper on the rails, this attempt was also unsuccessful (Tr. 53). Mr. Theurer tried again by using cylinders on the tamper to pivot a boom extending from the rear of the leveling tamper. Cantilevered on this boom were a rail clamp and vibrator which moved the track left or right, when the boom was so pivoted (Exs. 3, 162, Tr. 54). However the aligning force applied to the track behind the tamper tended to turn or skew the tamper frame on the rails in this attempt also, thus it was unsuccessful (Tr. 55).

In his fourth attempt Theurer mounted a cantilevered boom in front of the tamper with rail clamps and aligning cylinder on the end thereof (Exs. 163, 234, Tr. 55). This fourth attempt was not successful because applying the aligning force on a cantilever in front of the machine tended to turn or skew the frame of the tamper (Tr. 56).

During this period the competition was also attempting to solve the problem of a combined machine. In 1964–1965, Canron introduced its "Autoliner" (Exs. 20, 162, 214, 214A, 215, 215A, 216, 260, 261), which was a combination of Canron's standard "Autojack" tamper with a lining cylinder and ballast-engaging shoes in front (Ex. 164, Tr. 58–59). The Autoliner had enlarged jack shoes especially constructed to transmit the lining reaction to the ballast rather than to the rails (Tr. 724, 725). The lifting reaction was also taken by the ballast-engaging shoes (Tr. 724, 725).[6] The Autoliner had the disadvantage that the ballast-engaging shoes rested on the shoulder of the roadbed, the ballast, which made the machine unstable (Tr. 963–4). Because the ballast on the shoulder tended to be loose, the ballast-engaging shoes could not hold the machine frame still which caused the accurate lining to be lost. Also, at high elevations, the Autoliner tended to exert extreme force on the piston rods and also had a tendency to slide down when lining toward the outside of curves (Tr. 964). Further, the ballast shoes had to be reconstructed by the addition of downwardly disposed ribs on the bottom of the shoes to provide ballast anchoring to prevent the machine from slipping on the ballast in response to the lining reaction "like a cow on ice" (Tr. 725).

Plasser's '360 patent in suit is a high speed track leveling tamper of the over-

---

**6.** In discussing these machines it has been necessary to use terms such as "lifting" and "lining reaction forces." Although this court claims no expertise in the field, what is meant by these terms is simply that when a device lifts something there must be a counter reaction down toward the rail or ballast, and when a machine moves something to the left, there must be a reaction to the right, or vice versa.

The ballast-engaging shoes which we have spoken of, take these forces and transmit them to the ballast. In later inventions, these forces were transmitted to the rails instead, partly to increase stability, and partly to hold the corrected rails in place. We thus encounter Bacon's law that "for every action there is an equal and opposite reaction".

hung type[7] to which a structural beam was attached extending from the front end thereof. One or more lining means were attached thereto which operated between the rail clamps and the boom, with lining taking place at or adjacent to the point of lifting and tamping and the lining reaction being taken by the rails through the boom according to the bridge principle rather than on the ballast (Ex. 1).[8]

Plasser first embodied the subject matter of the '360 patent in a machine known as the Plasser 06–32L (Tr. 72), which was first demonstrated in the United States at a trade show in March of 1965. This machine was the first combined leveling high speed tamper with lining capabilities where the lining was done at or adjacent to the point of lifting and tamping and the lining reaction was taken by the rails instead of the ballast (Tr. 63). The '360 patent solved the problem. It substantially improved the accuracy of both the alignment, in a vertical plane, and the level, in a horizontal plane of the rails of the track and was a high speed combined tamper (Tr. 63). The problems of instability and skewing of the corrected portion of the track, had been beaten.

Plasser decided not to manufacture the 06–32L in the U.S. because it was designed in Austria for European track which is substantially lighter than U.S. track, it was a two-tie tamper, whereas U.S. track normally accepts only a one-tie tamper, and its specific construction was not suitable (Tr. 72, 73, 629, 630). Instead of redesigning the 06–32L for U.S. track, Plasser decided to design and market a full bridging combined machine in which the tamping, lifting and leveling as well as the lining takes place between the axles of a machine with an extended frame (Tr. 80). Thus the lining reactions would be taken from the lining and leveling means through the beam to the axles at either end of the beam, rather than to an axle at one end and a buggy at the other as in the '360 patent. This was the Plasser '297 patent which was embodied by Plasser in a full bridging combined machine known as the "Universal 06–16" which was first introduced in the United States in 1968 (PX 170, Tr. 80–82).[9]

In 1974, some ten years after Canron attempted to solve the problem with its Autoliner, Canron introduced the Torsion Beam in the United States. This machine is a beam-type structure connected to the front of an overhung tamper and extending forwardly therefrom so that lining is accomplished approximately at the point of lifting and tamping and the lining reaction is taken by the rails through the beam, rather than on the ballast (Exs. 101–107B, 167, UF 9, Tr. 74, 75, 183–196). The Torsion Beam embodies bridge-type lining into an overhung tamper so that the reaction force from the lining is transferred from the lining means to the beam to the rails, and not on the ballast, at the point of lifting and tamping. Furthermore the lifting action is of a bridge-type also, so that a full bridging reaction is effected for lifting and lining and the reaction from both of these operations is taken by the rails, rather than on the ballast (Exs. 101–107B, 167, Tr. 74, 75, 183–196).

Canron's Mark III Machine is of the full bridge species in which the lifting, lining and tamping takes place on an elongated frame supported on two axles, without any ballast-engaging shoes (Exs. 56, 57, 57A, 171, Tr. 93–97, 237–240). The Mark III was introduced in the United States in 1977, some 13 years after Canron attempted to

---

7. "Overhung type" involved a tamper hanging from a beam which was of sufficient length that the front axle was situated on the portion of the track that had already been tamped. This allowed the reaction force to be passed from the tamper to the beam to the axles to the already tamped portion of the track, instead of on the pre-tamped portion which could have been lowered even before it was completely or finally tamped.

8. In the "bridge principle" the reaction force is taken from the lifting and lining means through the boom to the axle or buggy at the ends of the boom and then to the track, rather than to the ballast through a ballast-engaging shoe.

9. Although the "06–16" was a unitary elongated construction, the '297 patent may alternatively be constructed as two subframes joined together.

solve the problem with its Autoliner machine.

For purposes of the infringement issue, it should be noted that Canron knew of Plasser's '360 patent at the time it introduced the accused Torsion Beam machine. Canron also knew of Plasser's '297 patent in suit at the time it introduced the accused Torsion Beam and Mark III machines. Further, Canron knew of the embodiment of these patents into the 06–32L machine at the time it introduced the Torsion Beam, and of the 06–16 machine at the time it introduced the Mark III machine.

## THE ISSUE OF VALIDITY

[1, 2] Due to the various similar mechanical structures and function of the patented and accused machines, the crucial issue in this case is the validity of the Plasser patents in view of the prior art. There are three primary means for invalidating the patents, one of which is the utility test which is not an issue in this suit. 35 U.S.C. § 101. Canron has alleged that Plasser's inventions were anticipated under 35 U.S.C. § 102, this court deals with that issue summarily. Anticipation requires that a very similar invention exist in one example of prior art. The evidence fails to indicate that any such prior invention exists, and this court rules in favor of Plasser on this issue. The final method for defeating a patent, and the one which is crucial to this case, is the obviousness test of 35 U.S.C. § 103.[10]

Canron is accused of infringing Claims 1 and 2 of patent '297,[11] Ex. 11, by its Torsion Beam machine and by its Mark III machine. Plasser also accuses Canron's Torsion Beam machine of infringing Claims 1 through 4 of patent '360, Ex. 1.[12] However, the Mark III is not accused of infringing any claims in patent '360.

10. Title 35, § 103 reads:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

11. Claims 1 and 2 of the U.S. Patent 3,494,297 are as follows:

1. An improved mobile track maintenance machine arranged for movement on the track in a direction of track elongation and comprising a carriage frame having two ends, a front truck and a rear truck respectively supporting each carriage frame end for movement on the track, track tamping means and track grading means mounted on the carriage frame, the track grading means being constructed to lift the track and the tamping means being arranged to fix the track in the lifted position by tamping ballast under spaced ties supporting the track, and means for laterally aligning the track mounted on the carriage frame intermediate the trucks.

2. The mobile track maintenance machine of Claim 1, further comprising a reference line for laterally aligning the track in relation thereto, another reference line for grading the track in relation thereto, and a front bogie movable on the track and supporting one of the ends of both reference lines.

12. Claims 1 through 4 of the U.S. Patent 3,425,-360 are as follows:

1. In a mobile track correcting machine comprising a machine frame, and means mounted on the machine frame for engagement with a selected one of the track rails and for exerting a lateral thrust against the selected track rail, the improvement of

(1) an elongated thrust receiving element associated with the thrust exerting means for receiving the back pressure of said thrust,

(a) the elongated element extending between the track rails, with the thrust exerting means being positioned between the selected track rail and the elongated element,

(b) one end of the elongated element being connected to the machine frame, and

(2) a truck arranged on the track at a point spaced from the machine frame,

(c) the other end of the elongated element being connected to the truck.

2. The mobile track correcting machine of Claim 1, further comprising means for lifting the track and means for tamping ballast to fix the corrected track in position whereby the machine is useful for track lining and grading.

3. The mobile track correcting machine of Claim 1, wherein at least one of the elongated element ends has a pivotal connection.

4. The mobile track correcting machine of Claim 1, the machine having a front axle and a rear axle, and a front portion of the machine frame extending forwardly of the front axle, the one elongated element end being connected to the front portion.

▐ The leading case with respect to obviousness is the oft-cited *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965). In the *Graham* case, the Supreme Court set forth specific guidelines for evaluating a patent for obviousness under 35 U.S.C. § 103, as follows at 383 U.S. 17:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

Accordingly, the scope and content of the prior art will first be determined, the level of skill in the art will be considered, the alleged inventions of the patents in suit will be considered, and finally the differences between the prior art and the claims at issue will be ascertained with the view of determining obviousness.

As stated earlier, both Plasser's '360 and '297 patents find a full response, both in terms and substance, in prior foregoing applications. Claims 1 through 4 of Plasser's '360 patent find a full response in Plasser's Austrian application Serial No. A 349/65, filed January 18, 1965 (Tr. 992–3), and in Plasser's Austrian application Serial No. A 2116/65, filed March 9, 1965 (Tr. 992–3). The relevant prior applications as to Claims 1 and 2 of Plasser's '297 patent in suit are as follows: Austrian application serial number A 11099/64 filed December 31, 1964 (Tr. 991–2); Austrian application serial number A 10915/65, filed December 6, 1965 (Tr. 991–2); Austrian application serial number A 8972/66, filed September 26, 1966 (Tr. 991–2).

▐ It is elementary to patent law that a patent is presumed valid. Title 35, § 282.[13] The Fourth Circuit Court of Appeals has recently stated the basis for this presumption when it said:

Expertness and experience in passing upon patents lies primarily in the Patent Office and these important factors are only partially offset by the greater concentration and the additional relevant evidence which can be brought to bear in any particular patent litigation in the courts.

*Tights, Inc. v. Acme-McCrary Corp., et al.,* 541 F.2d 1047, 1053 (4th Cir. 1976). To overcome this presumption a Defendant must first show clear and convincing proof of the invalidity of the patent. *Mercantile National Bank of Chicago v. Quest, Inc.,* 431 F.2d 261, 264 (7th Cir. 1970). This presumption is a matter of real substance and power. With apologies for citing this court's prior decision, we quote from the case of *Grinnell Corp. v. American Monorail Co.,* 285 F.Supp. 219, 223 (D.S.C. 1967).

The presumption of validity and the severe burden it places on Defendant, are based largely on the fact that to hold a patent invalid in an infringement action involves overruling of a decision by an arm of a co-ordinate branch of the government especially empowered to pass upon patentability and specially trained in the technical questions involved. Thus it is the duty of the Patent Office carefully to examine each patent application in the light of all statutory requirements for patentability and to withhold issuance unless 'it appears that the applicant is entitled to patent under the law.' 35 U.S.C. Section 131.

Of course, the strength of this presumption depends on whether the Patent Office had before it at the time it granted the patent, the most relevant prior art. If it did, the presumption is reinforced. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corporation,* 372 F.2d 263, 268 (2nd Cir. 1967).

---

13. This section reads, "A patent shall be presumed valid ... the burden of establishing in- validity of a patent or any claims thereof shall rest on the parties asserting it."

This court has carefully and laboriously examined the scope and content of the prior art as exemplified by Exhibits 5–8, 10, 20, 21, 22, 27–29, 39, 40, 65–68, 73, 76, 80, 85–87, 91–99, 214, 215, 232, 233–242, 253, 256–259, 265, 282A, 406, 407, 420–424, 430, 431, plus

(a) Plasser's VKR–03 machine.
(b) Plasser's VKR–04 machine.
(c) Plasser's VKR–05 machine.
(d) Canron's Electromatic machine.
(e) Canron's Autojack Electromatic machine.
(f) Nordberg's Trakliner Machine.
(g) Nordberg's Line Indicator Machine.
(h) Nordberg's Switch Liner Machine.
(Stipulated Fact # 36)

After careful examination of the evidence and exhibits and rereading the transcript of trial, this court is convinced that the closest reference to the Plasser '360 patent in suit is Christoff 3,170,410, Ex. 86, which was cited by the Patent Examiner during the prosecution of the '360 patent. None of the references cited here by Canron and not cited by the Patent Examiner is as pertinent as Christoff '410 (Tr. 728, 729, at 989.).[14]

Christoff '410 was a file reference cited by the Patent Office and considered during the prosecution of the Plasser '360 patent. Canron has cited the Australian equivalent '091 (Ex. 73), but it is the same patent. The patents disclose a long girder with a liner head, 122, between the ends. The liner head has rollers on the four corners which bear against the insides of the rail. Canron claims that this liner head constitutes a lining means, but after examination of the record, this court cannot agree. In Christoff '410, Ex. 861 the machine moves continuously and the liner head is adjusted and set, prior to operation on tangent track. There is no disclosure of operating the liner head laterally during the movement of the machine (Tr. 712, 984). Furthermore, there is no disclosure of suggestion of a reference line on the machine (Tr. 709, 710), which would accurately adjust the alignment of

track, as in the Plasser '360. In fact, with the liner head fixed, the boom in Christoff would deflect either left or right, which would cause the track not to be accurately aligned (Tr. 715, 716).

Another essential difference is that in Christoff '410, the boom is a thrust-transmitting element rather than a thrust reaction receiving element. There the thrust-exerting means is the self-propelled rear car (222 in Fig. 19 of Ex. 86) which provides "a thrusting action" on the boom 20 so that the rear cart is the thrust-exerting means and the boom 20 and the liner head 122 are a means to transmit the thrust to the rails (Tr. 714, 715, 983–5). Thus this court must agree with the Patent Examiner that Christoff '410 does not disclose or suggest any elongated thrust-receiving element associated with the thrust-exerting means for receiving the back pressure of the thrust-exerting means as called for by claims 1–4 of the Plasser '360 patent (Tr. 714, 715, 984–985).

This court is also of the opinion that Stewart Patent 3,371,619, Exs. 9, 203, cited by the Patent Examiner, is the closest reference to the Plasser '297 patent in suit. None of the references cited by Canron and not cited by the Patent Examiner is as pertinent as Stewart '619 (Tr. 733, 989). Fig. 1 of Stewart's '619, Ex. 9, discloses separate cars with a ballast-engaging shoe on the middle cart. Thus we do not have a full bridging type effect as in the '297 or '360 patent so that the lining reaction is taken by the rails rather than the ballast, rather we are back with the old ballast-engaging types (Tr. 720, 721). Fig. 3 of this patent does not have a track-grading or leveling means constructed to lift the track and it does not have track tamping means to fix the track in a lifted position, as called for in Claims 1 and 2 of the '297 patent (Tr. 721). Nor do any of the various forms in Stewart '619 disclose an elongated, thrust-receiving element associated with the thrust-exerting means for receiving the

14. Christoff Australian Patent No. 091, Ex. 73, is the same as Christoff U.S. Patent '410, Ex. 86.

back pressure of the thrust, as called for in Claims 1 through 4 of the '360 patent.

Realizing this Canron has argued that the Stewart '619 can be used "in coordination with" (Col. 1, line 49), "in conjunction with" (Col. 4, at lines 19 and 20), "could be tied into" (Col. 4, lines 28 and 29) the Autojack of Stewart '834, Ex. 10. However Stewart '619 does not explain how these two machines could be successfully combined, but merely suggests the use of the two separate machines, one behind the other in the manner of the prior art. Thus Stewart '619 discloses nothing other than a use which was considered the "problem" prior to the invention of the '360 and '297 patents in suit. Finally, any connection between the Fig. 3 liner of Stewart '619 and the Autojack of Stewart '834 would present problems in that the Stewart '619 is a continuously moving machine and the Autojack is a step-by-step machine. Finally, Stewart '619 does not disclose or suggest means for laterally aligning the track mounted on the carriage frame intermediate the trucks in a combined leveling, lining tamper, so that the lining reaction is taken by the rails rather than by the ballast on the shoulder of the track (Tr. 535, 796, 979). Thus Stewart '619 fails to disclose the essence of the '297 invention.

■ The various patents on moving machines cited by Canron (Exs. 5, 6, 7, 8, 22, 76) are from a nonanalogous art, are concerned with bodily moving track away from coal piles, slag piles, or the like that build up in mining and mill operations (Tr. 696), and are not concerned with the accurate leveling and lining of track. Any raising that takes place in these machines is merely to aid in moving the track and does not result in a new grade or level (Tr. 697, 698). They do not straighten track (Tr. 697). None of them has or could use a leveling or lining reference line (Tr. 846–849, 886, 887).

Q. Now, when you are talking about a moving machine, there would really be no way to use a lining reference line on such a machine as you moved it 8 inches to one side, would there?

A. Why not? The fact of the matter is that the Autojack-Autoliner Electromatic will move track 8 inches with respect to a reference line.

Q. Is the Autoliner just a moving machine?

A. No, sir.

Q. That is a lining machine, is it not?

A. When you are moving it 8 inches, you are moving it. You are not lining it. (Glasser, Canron's witness, Tr. 704).

Most of them do not have tampers (Exs. 5, 6, 7, 22). Those that have tampers (Exs. 8 and 74) do not use them to fix the track in a raised or leveled position, but are two step machines in that the track is shifted sideways on the first pass and the tampers are only used on a second pass (Tr. 698–701, 846–849). These references are quite remote from the subject matter of the '360 and '297 patents in suit (Tr. 886). The Russian machine (Ex. 85, translation Ex. 84B) is a continuously moving track rebuilding machine, which reshapes the gravel bed of the track and is not a tamper in the sense of the patents in suit (Tr. 895–901). It does not have reference lines, either for leveling or for lining (Tr. 902), and is not close to the '297 patent in suit and has no relation at all to the '360 patent in suit.

The French Plasser patent 1,355,836, Ex. 99 is the same machine as the Plasser '803, which represents Mr. Theurer's first unsuccessful attempt to solve the problem. It should not be considered material to either patent in suit.

The Autoliner which Canron contends was in public use in the U.S. prior to December 31, 1964, is the same as the Fig. 5 disclosure in Stewart '619 (Tr. 723, 724, 807). So the Autoliner was before the Patent Office during the prosecution of the '297 and '360 patents and is a file wrapper reference which has already been considered by the Patent Office. The Autoliner is an overhung tamper in which the lifting and lining takes place ahead of the tamper by means of a cross frame with rail clamps and a ballast-engaging jack shoe, which transmits the lifting and lining reactions to the ballast, so that the frame of the

machine itself, and the rails, play no part (Tr. 724, 925). The Autoliner does not employ the bridging principle for either function (Tr. 58–60, 724, 725). Thus it is fundamentally different from the patents in suit. In fact, Canron introduced the Torsion Beam Machine some 10 years after it attempted to solve the problem with the Autoliner, and introduced the accused Mark III in 1977, some 13 years after the introduction of the Autoliner. If the Autoliner was the clear predecessor to the solution of the problem, why did Canron wait so long to introduce these other machines.

"The Railway Engineer" (Der Eisenbahn Ingenieur) Article, Ex. 265 (Translation Ex. 605), is substantially the same as the Fig. 3 disclosure of Stewart '619 and was in effect before the Patent Office during the prosecution of the patents in suit, and is therefore a file wrapper reference.

In conclusion, none of the prior art discloses or suggests the addition of a boom to the front of an overhung leveling tamper, to which boom is connected one or more lining cylinders so that the track lining takes place at, or adjacent to, the point of lifting and tamping, and the lining reaction is taken by the rails through the boom, rather than on the ballast. Nor does any of the prior art disclose or suggest a combined tamping, leveling, and lining machine in which the lining reaction is taken between the axles of the machine on the rails, instead of on the ballast.

This court finds that Claims 1 through 4 of Plasser's '360 patent differ significantly from the prior art in that they call for an elongated thrust-receiving element associated with the thrust-exerting means, which is the lining cylinder, for receiving the back pressure of the thrust, with the elongated element extending between the track rails, with the thrust-exerting means being constructed to apply a thrust in either direction to line the rails at the same time that they are being lifted and tamped, with the reaction of the thrust-exerting means being taken by the rails rather than the ballast.

This court also finds that Claims 1 and 2 of Plasser's '297 patent in suit differ significantly from the prior art in that they call for means for laterally aligning the track mounted on the carriage frame intermediate the trucks with track-tamping and track-grading means on the carriage frame so that lifting, lining and tamping all take place on the carriage frame with the vertical and horizontal reactions therefrom being taken by the rails, rather than the ballast.

The question of this lawsuit is whether these differences were obvious to a man possessing the level of ordinary skill in the track maintenance machinery art in the 1962–66 period. The parties seem to agree in general that a man of ordinary skill in that period would generally have a level of skill resulting from a technical educational background rather than a formal engineering degree, combined with practical experience in the track improvement field, and a basic understanding of electrical, hydraulic and pneumatic components along with structural and mechanical component principles (Tr. 947, 948, 961–963). Canron contends there would also be a general knowledge of existing commercial machinery. Accepting this contention, this court is convinced that a man of ordinary skill would not have been able to combine the prior art in such a way as to make the inventions of the '360 and '297 patents obvious.

This conclusion is strengthened by the citation of, and reliance upon, some 70 pieces of prior art by Canron, which is indicative of invention as well as the futility of prior attempts to solve the problem. *Hoeltke v. C.M. Kemp Mfg. Co.,* 80 F.2d 912, 917 (4th Cir. 1936); *Binney & Smith v. United Carbon Co.,* 125 F.2d 255, 258 (4th Cir. 1942).

The massive prior art cited by Canron also illustrates the high degree of patent activity in this and related arts, which was unable to solve the problems despite continued efforts. Plasser's new combination of concepts produced this solution, evidence that the combination was not obvious. *Shaw v. E.B. & A.C. Whiting Co.,* 417 F.2d 1097, 1104 (2nd Cir. 1969), *cert. denied,* 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811

(1970). The Tenth Circuit capsulized this rule well when it said:

> [i]f those skilled in the art are working in a given field and have failed after repeated efforts to discover a particular new and useful improvement, the person who first makes the discovery does more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as the inventor.

*McCullough Tool v. Well Surveys, Inc.,* 343 F.2d 381, 399, 145 U.S.P.Q. 6, 20 (10th Cir. 1965), *cert. denied,* 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851, 148 U.S.P.Q. 772 (1966).

█ There can be no doubt that the individual elements of the '297 and '360 patent claims are ancient art. Clearly bridge-type tampers and liners have been used for years, as have reference lines, and booms and beams. This is true virtually of all inventions involving a combination of elements. However, it is the overall combination of elements which must be viewed as a whole in arriving at a determination as to patentability of the claimed subject matter. See *Entron of Maryland, Inc. v. Jerrold Electronics Corp.,* 295 F.2d 670 (4th Cir. 1961); *Marvel Specialty Co. v. Bell Hosiery Mills, Inc.,* 330 F.2d 164 (4th Cir. 1964). A combination is patentable if it produces new and useful results, though all its elements were known and in common use before it was made, provided the results are a product of the combination and not a mere aggregation of several results, or if it forms a new machine of distinct character or formation, or produces a result which is not the mere aggregation of separate contributions, but is due to the joint and cooperating action of all of the elements. It is patentable when the several elements, all of which may be old, produce by their joint action either a new and useful result, or an old result in a cheaper or otherwise more advantageous way. See *Colgate-Palmolive Co. v. Carter Products, Inc.,* 230 F.2d 855 (4th Cir. 1956).

█ The presumption of validity arising from the issuance of the patent may not be overcome by combining various selected elements from individual references to make up a mosaic. There must be positive evidence that the bringing together of such individual features would have been obvious to an ordinarily skilled person.

> It would reduce patent protection almost to a nullity if an infringer could, in the light of a subsequent disclosure, comb the prior art and piece together portions of earlier patents, while dropping other parts, and thereby invalidating a new combination of old elements.

*Bragg-Kliesrath Corp. v. Farrell,* 36 F.2d 845, 850 (2nd Cir. 1929).

█ The statutory presumption of validity is further strengthened where, as here, the principal prior art relied upon has been considered and rejected by the Patent Office. The failure of Canron to come up with new art that is any better than the file wrapper art is highly persuasive of validity. *Power Curbers, Inc. v. E.D. Etnyre & Co.,* 298 F.2d 484, 493 (4th Cir. 1962). This presumption is not weakened by the mere citation of art by Canron that was not of record in the Patent Office, but is merely cumulative to or no more pertinent than, the art actually cited by the Patent Examiner. *Marston v. J.C. Penney Co.,* 353 F.2d 976, 982 (4th Cir. 1965).

█ This court believes that while each of the Plasser inventions may comprise a combination of known elements, the combination achieved an unusual, unexpected, new and desirable "combined tamper with rail reaction" effect. This fulfills any requirement by the Supreme Court in *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976) and *Anderson's Black Rock v. Pavement Salvage Co.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). "A synergistic effect is achieved when the patentee uses and arranges his materials in such fashion that the combination achieves a theretofore unknown concept in the relevant art." *Deere & Co. v. International Harvester Co.,* 460 F.Supp. 523, 200 U.S. P.Q. 150 (D.C.S.D. Ill., 1978).

Finally, the commercial success of these patents is of special significance and is not taken lightly by this court. As stated in *Tights, Inc. v. Acme-McCrary Corp., supra,* at 1059:

> Finally, we note that there was substantial evidence introduced at trial as to the commercial success of the Rice claim.... The evidence of such commercial success is also relevant to the question of nonobviousness since it indicates the inventive nature of the product.

In light of the heavy burden facing them, Canron has attempted to narrow the scope of Plasser's claim so as to bring it within the obvious reach of prior art. First, Canron contended that any prior art that showed a lining mechanism located physically between the axles of a wheeled frame qualified as "means for laterally aligning the track mounted on the carriage frame intermediate the trucks" as recited in Claim 1 of the '297 patent. Such would be Talboys '616 (Ex. 233), Plasser '803 (Ex. 74), Talboys '123 (Ex. 91), Fig. 1 of Stewart's '619 (Ex. 9), as well as others, and a patent would not have issued.

This language from Claim 1 means that the reaction is taken by the rails not by the ballast through a ballast anchor (Tr. 530). The distinction is that in, for example, Talboys '616 (Ex. 233), when the machine is moving the track, the wheels are actually lifted up off the rails so that they are not performing their function (Tr. 680–2). The same is true of Plasser '803 (Ex. 74) which states that the ballast anchor lifts the machine off of the rails during lining (Col. 3, lines 56–60):

> The foot piece is carried by piston 15 vertically movable in hydraulic cylinder 14 so that the foot-piece may be moved into engagement with the ballast and *thus lift the machine off of the track rails* sufficiently to remove the load from the track and thus make its lateral movement easier.

The wheels, axles, and frame of the machine do not take any lining reaction in a "ballast anchor machine" as Canron's Glasser referred to it.

A second contention of Canron in reference to the '297 patent is that the "track grading means," in Claim 1, does not require a reference line because some of the prior art recited in the specification of the Plasser '297 patent (col. 4, lines 1–4) do not have reference lines (Tr. 519). The fact is that two of the prior art patents referred to don't and three do (Tr. 744–5). In any event, the text of the '297 patent in column 4, lines 1–4 makes it clear that the details of the lining mechanism, i.e. the cylinders for moving the track, the referencing arrangements, etc. all may be conventional. The '297 patent is not restricted to any particular type of reference line, be it a wire, a light-beam, or any specific track-moving arrangement, other than "the positioning of such means as herein disclosed." (col. 4, lines 9, 10).

Canron makes an attempt to deny Plasser the use of reference lines to insure accurate lining and leveling, through the doctrine of claim differentiation. The theory of claim differentiation is that anything recited in a dependent claim cannot be included in its independent claim, thus Claim 2 of the '297 patent which is dependent on Claim 1, cannot be included in Claim 1 under this doctrine.

The simple answer here is that Claim 2 calls for the separate element "a front buggy movable on the track and supporting one of the ends of both reference lines." This is new and not included in Claim 1. The recitation in Claim 2 of "a reference line for laterally aligning the track in relation thereto, another reference line for grading the track in relation thereto" is merely to provide specific background for the recitation thereafter that the front buggy supports one end of both reference lines. Such does not preclude the "track grading means" and "means for laterally aligning the track" recited in Claim 1 from including reference lines, which they must (Tr. 213). You can move track without lining it. But you can't line or level without a reference line.

Q. But you can move [track] sideways without aligning it, can you not?

A. Yes.

Q. You described several machines as being capable of lining. You were saying then that they had mechanism for moving track but they did not necessarily have a reference line?

A. That's right (Glasser Tr. 692–3).

Track lining includes a reference line (Tr. 692). The same is true of leveling (Tr. 693).

█ Canron contends that Plaintiff engaged in misconduct before the Patent Office during prosecution of the '297 and '360 patents and that the patents should be rendered unenforceable in this suit. There is no evidence that Plasser intentionally withheld any material prior art from the U.S. Patent Office. The most that can be said is that Plasser inadvertently or innocently failed to cite the German moving machine patents (Exs. 5–8, 76, 253) to the Patent Office. And even if they had been brought to the attention of the Patent Office they would not have had any effect in view of this court's determination that they are not as pertinent as the file wrapper prior art.

█ Patent Claims 1 and 2 of the '297 (Claims 21 and 27 respectively of application Nos. 668, 266, Ex. 114) were allowed only after a response filed February 19, 1969, by Plasser (Ex. 114, pp. 38–45) to the Office Action of October 21, 1968 (Ex. 114, pp. 30–32), in which both application Claims 21 and 27 were rejected (Ex. 114, p. 31). Canron views the response of Plasser as a fraudulent, reckless, or grossly negligent attempt by Plasser to steer the examiner away from the clearly pertinent prior art of Fig. 3 of Stewart '619. This court is not persuaded that Plasser engaged in anything less than good faith, and certainly is not convinced to a clear and convincing degree that fraud, recklessness, or gross negligence was involved. Plasser's Kelman was of the opinion that Fig. 5 of Stewart's '619 was the more pertinent prior art since it showed a tamping and aligning machine in combination, which was the heart of the Plasser invention (Tr. 1001–1003). Since the response directed the Patent Examiner's attention to Fig. 5 of the Stewart patent, Plasser fulfilled its duty of candid disclo-

sure to the Patent Office. The opinion of Canron's Burke that Fig. 3 might well have invalidated the patent which was subsequently issued, was merely an opinion, and one with which this court disagrees (Tr. 793–811). Furthermore, Fig. 3 was clearly before the Patent Office since Stewart '619 is a file wrapper reference to the '297 patent and the Patent Examiner was clearly familiar with the state of the arts since he had handled both '360 and '297 patents in suit. This contention is without merit.

█ Canron's final grounds for challenging the validity of the Plasser patents is that the patents are too indefinite to inform the public of the limits of the monopoly asserted. 35 U.S.C. § 112 requires the specification to be written in "such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . ." The specification must then conclude "with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention". While Claims 1 and 2 of Patent '297 did not specify that the distance between the wheels or trucks supporting the ends of the carriage frame be large or great, this would be a matter which is commonly understood by persons skilled in the art. *Application of Myers,* 410 F.2d 420 (C.C.P.A., 1969). For in order to lift the rail between the axles, the axles would have to be far enough apart to allow this operation to be done efficiently, a principle common to many bridge-type machines. As to the '360 patent, the absence of a ballast-engaging shoe in the claims would make it obvious to one skilled in the art that the reaction forces were to be transmitted to the rails via the wheels or trucks. Such is the clear import of the claims which disclose the connection of the elongated element to the frame on one end and the truck on the other. Accordingly, the '297 and '360 patents do not suffer from indefiniteness under Section 112.

Therefore this court makes the following findings:

(a) The subject matter of Claims 1–4 of Plasser's '360 patent would not have been obvious to a man of ordinary skill in the railroad track maintenance machinery art in the 1962–66 period (Tr. 48–50, 964–966).

(b) The subject matter of Claims 1 and 2 of Plasser's '297 patent in suit would not have been obvious to a man of ordinary skill in the railroad track maintenance machine art in the 1962–66 period (Tr. 48–50, 964–966).

(c) The need for improved accuracy both in the level and line of railroad track in the 1962–66 period was apparent and important (Tr. 46–48).

(d) Commercial models which embodied the '297 patent have enjoyed substantial commercial success in the United States as well as on a worldwide basis.

(e) Claims 1–4 of Plasser's '360 patent in suit and Claims 1 and 2 of Plasser's '297 patent in suit are not anticipated by any of the prior art.

(f) The subject matter of Claims 1–4 of Plasser's '360 patent in suit was not in public use or on sale in the United States prior to January 18, 1965.

(g) The subject matter of Claims 1 and 2 of Plasser's '297 patent in suit was not in public use or on sale in the United States prior to December 31, 1964.

(h) Canron has submitted no evidence tending to establish that either the '360 or '297 patent does not comply with 35 U.S.C. § 112.

### INFRINGEMENT ISSUE

In determining whether an accused device infringes a patent, resort must be had in the first instance to the words of the claim. If the accused matter falls clearly within the claim, infringement is made out and that is the end of it. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). However, direct infringement may also be proved under the doctrine of equivalents. For no mere colorable departure from a literal reading of the claims will avoid infringement, or else a patent would be turned into a hollow thing. As stated by this court in the *Duplan Corp. v. Deering Milliken, Inc., et al.,* 370 F.Supp. 769, 774 (D.S.C. 1973):

> The doctrine of equivalents states that there is a direct infringement of a patent claim if the accused device performs substantially the same function in substantially the same way to obtain substantially the same result.

Where an accused infringer fails to offer any technical or engineering evidence as to why a minor variation from the literal language of the claim is of any significance, the court can only assume that any such differences are colorable and were adopted by the Defendant for patent purposes only. As stated by the District Court in *Ransburg Electro-Coating Corp. v. Proctor Electric Co., Inc., et al.,* 203 F.Supp. 235 (1962), *affirmed* 317 F.2d 302 (4th Cir. 1963), page 258:

> The court will not agree that a minor change in design, intended to take advantage of the inventive concept of the '602 patent, can avoid infringement, particularly when the change offers no justification other than apparently conscious effort to depart from the true circle, and so avoid letter-perfect infringement.

With these principles in mind, this court proceeds to determine whether the Torsion Beam Machine infringes upon the Plasser '360 patent under the doctrine of equivalents and whether the Mark III and the Torsion Beam Machine infringe on the Plasser '297 patent under the same doctrine.

### INFRINGEMENT OF PLASSER '360 BY THE TORSION BEAM MACHINE

[16] Claims 1–4 of the '360 patent were application Claims 1–4 as filed. Plasser rewrote Claim 1 and its Claim 16 to put it in "preamble" form (Ex. 118, p. 7). Otherwise the claim, both in terms and substance, remain the same. Thus Claims 1–4 of the '360 patent were allowed and issued without change. So there is no file wrapper estoppel involved here.

Claim 1 of the '360 patent calls for a "means mounted on the machine frame ... for exerting a lateral thrust against" the track rails, referring to the rail clamps 10 and lining cylinders 9 which together are connected both to the front of the tamper as well as the beam (Ex. 1), whereas the rail clamps and lining cylinders on the Torsion Beam Machine are on the beam and are not directly mounted on or connected to the machine frame (Exs. 106 A & B, 107 A & B, 167, Tr. 200). The mounting of the rail clamps on the front of the tamper frame is old and well known in the art as shown in the Plasser 04–05 machine (Exs. 3, 157),[15] and Canron's Autojack (Ex. 10). There is no evidence that mounting the rail clamps and lining cylinders either totally on the beam, as in Canron's Torsion Beam Machine, or partially on the beam and partially on the front of the tamper frame, as in the '360 patent, is of any engineering or technical significance. In fact, the specification of the '360 patent indicates that the mounting of the rail clamps and lining cylinders on the front of the tamper frame was not considered critical by Plasser and could be varied:

We *prefer* to mount the track lifting and lateral moving means as well as track tamping means, on this overhanging front portion of the machine frame. (Col. 1, lines 35–47).

Furthermore, the track moving and fixing means 9, 11, 12 need *not be mounted* in an overhanging front portion of the machine frame, as illustrated.... (Col. 4, lines 71–73). (Emphasis added).

■ Canron did not present any evidence that mounting the rail clamps and lining cylinders totally on the beam, as in the Torsion Beam Machine, was not the full engineering and technical equivalent of mounting them partially on the beam and partially on the front of the tamper frame, as in the '360 patent. The Fourth Circuit follows the well-established law that infringement is not avoided by a minor varia-

tion. In *Matthews v. Allen*, 182 F.2d 824, 827–828 (4th Cir. 1950), the court states:

Obviously this argument cannot prevail for even if the quoted language should be considered a limitation upon the claims, infringement would not be avoided since the structure would still enable the infringer to embody the heart of the invention although it might be done somewhat imperfectly. The variations ... must be examined under the well established rule that one does not avoid infringement by following the teachings of a patent imperfectly or by constructing a device that does not function as well as the patented structure, so long as he appropriates the substance of the invention. [Citing cases].

■ The court has resorted to the file wrapper as an aid to construction and interpretation of the phrases in the patent claim as the construction of the patent claims is a question of law for the court. *Duplan, supra,* at 772. This court in discharging its duty, may have recourse to the patent's specification, drawings, and file wrapper to discern the meaning of terms of art. *Morpul, Inc. v. Glen Raven Knitting Mill, Inc.,* 357 F.2d 732, 736 (4th Cir. 1966).

■ Having found that file wrapper estoppel is not applicable here, the patentee is not barred from recourse to the doctrine of equivalents. *Toy Ideas, Inc. v. Montgomery Ward & Co.,* 172 F.Supp. 878, 883 (D.M.D. 1959). The limits on this doctrine were stated by the Court of Claims in *Bendix Corp. v. United States,* 199 U.S.P.Q. 203, 225 (Ct. Claims, 1978):

The doctrine of equivalents may not be applied in interpreting the scope of claims where (a) the interpretation would preclude patentability in view of the prior art, or, (b) the interpretation extends the range of equivalents to include *essential* means which have been clearly disclosed in the prior art.

■ However, within these limits an accused structure will be held to infringe un-

**15.** The Plasser 04–05 machine was before the Examiner during the prosecution of the '360 patent. Plasser's '625 (Ex. 3, cited by the Examiner against the '360 patent, shows all the essential elements of the Plasser 04–05 machine.

der the doctrine of equivalents where it employs each of the essential elements of the patent claim or its equivalent. See *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950):

> One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

■ There is evidence to support the fact that mounting the rail clamps and lining cylinders totally on the beam, as in the Torsion Beam Machine, is the engineering or mechanical equivalent of mounting them partially on the beam and partially on the front of the tamper frame, as in the '360 patent (Tr. 200). Thus they are held to be mechanical equivalents. They perform substantially the same function in substantially the same way to obtain the same result.

There is no evidence that the use of the so-called reaction pads in the Torsion Beam as compared to mounting the rear end of the beam formally on the front axle of the tamper, as disclosed in the '360 patent, is of any engineering or technical significance. The reaction pads are located on the rear of the beam and engage the rail an inch or two in front of the front wheels of the tamper when either a vertical or a lateral load is applied to the beam, but are otherwise out of contact with the rails. Thus the reaction force is passed to the rails at a point very close to the axle, and thus very close to the area where the reaction force is passed to the rail in the '360 patent. They perform substantially the same function in substantially the same way to obtain the same result.

■ Claim 1 of the '360 patent recites that the rail clamps and lining cylinders engage "a selected one of the track rails" and exert a lateral thrust against the "selected" track rail (Ex. 1). While the Torsion Beam Machine does engage both rails at the same time, this is at most a mere improvement on the '360 patent. Obviously the '360 patent does not mean that only one rail, either the left or the right, is moved because rails are an integral track structure joined together by the ties. If one rail is moved laterally in response to a lateral thrust, the other rail will be pulled along with it, either through the ties or through a unitary rail clamp (Tr. 264, 265, 977). The specification of the '360 patent indicates that the expression "selected rail" is used to indicate direction (col. 2, line 23). While the Canron improvement may lessen the chance that one rail will pull away from the tie and leave the other in an uncorrected position, this distinction is minor.

Accordingly, this court finds that any differences between Canron Torsion Beam Machine and Claims 1–4 of Plasser's '360 patent are improvements thereon or the mechanical equivalent thereof. This court also finds that the Torsion Beam Machine responds both in terms and in substance to Claims 1–4 of Plasser's '360 patent.

### INFRINGEMENT OF THE '297 PATENT BY THE TORSION BEAM MACHINE AND THE MARK III MACHINE

Plasser's Fishleigh testified that he found a full response, both in terms and substance, to Claims 1 and 2 of the '297 patent in the Mark III machine (Tr. 241–3). Canron offered no testimony or evidence to the contrary. Any differences between Canron's Mark III machine and Claims 1 and 2 of the '297 patent are either improvements thereon or mechanical equivalents thereof (Tr. 237–244). So the Mark III stands admitted as an infringement of the '297 patent.

The more difficult question is whether the Torsion Beam Machine, which is very similar to the '360 patent requires that the tamping machine be designed and built

from the beginning to this style of design. On the other hand an obvious advantage of the Torsion Beam Machine is that a beam carrying the lifting and/or lining means may be connected to the propelling vehicle which might be a tamping machine of conventional design with its tamping heads cantilevered ahead of the front axle of the vehicle. Thus one would not be required to purchase a new machine, but could merely modify the present equipment.

Plasser's Fishleigh testified that he found a full response, both in terms and in substance, in the Torsion Beam for Claims 1 and 2 of Patent '297 (Tr. 234–236). Canron's Glasser based his disagreement with Plasser on the last limitation "means for laterally aligning the track mounted on the carriage frame intermediate the trucks." In '297 the lining reaction is not taken laterally by ballast shoes on the shoulders on each side, as in the Autoliner, but rather is taken longitudinally through the frame and through the trucks (and/or wheels) to the rails.[16] In the Torsion Beam the lining reaction is not taken through the frame, but is taken longitudinally through the beam itself and through the small dolly at the front end on the rail. At the rear end it is taken mostly by what Canron termed its reaction pads positioned directly in front of the front wheels of the tamper.

It is clear that the same result is reached by both machines, namely that the lining reaction is taken by the rails, rather than by the ballast. This results in greater stability for the machine which leads to more accurate adjustments, and also results in less skewing of the track.

It is also clear that the beams serve the same function, namely to transmit the reaction forces to the rails to increase accuracy.

There is no evidence in this record as to why it is technically undesirable to take the lining reaction off the front axle of the tamper. There is no engineering explanation as to why the so-called reaction pads are an improvement, or a necessity, or de-

sirable, or advantageous, other than that they give Canron a possible non-infringement position. Whether the lining reaction is taken totally by the front wheels of the tamper or a little by the front wheels and mostly by the reaction pads or half and half—or whatever—has no technical or engineering justification.

Canron did not argue at trial that the reaction pads allow for the modification of an already existing machine. First, Canron has never attempted to offer the Torsion Beam commercially as an attachment to an already owned machine, but instead all market the entire tamping and lining combination. Second, there is no reason why the beam could not be attached to the frame in order that the reaction could be passed to the frame rather than through the reaction pads.

Finally, Canron's Glasser found no difference between the Mark III which does not have reaction pads, and the Torsion Beam, which does (Tr. 727–8):

Q. That particular speculative combination of the Autojack with Fig. 3 (of Stewart's '619), which is that closest to? The Mark III or the Torsion Beam?

A. In the Mark III and the Torsion Beam with the lining being between a front and rear rail—engaging—device, I would have to say that six of one half a dozen of the other; it is still a bridge-type lining action.

Q. So in that respect, that (speculative) combination plus the Torsion Beam plus the Mark III, they are all about the same?

A. From the point of reaction from lining means yes.

The importance of this Glasser testimony is that it shows how little engineering and technical significance he attaches to the reaction pads. Stated simply, they are a distinction without a difference. Quoting from the Second Circuit in *Broadview*

---

**16.** Canron's Glasser on direct examination interpreted "intermediate the trucks" as meaning lining reaction, not physical location (Tr. 530).

This was subject to some editing the next day (Tr. 652–665), however Glasser's spontaneous testimony the day before is far more creditable.

*Chemical Corp. v. Loctite Corporation,* 406 F.2d 538, 542 (2d Cir. 1969):

> But it is old and obvious learning that a patent may not be avoided by making unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, are then put forth as answers to infringement charges.

The means used to perform identical functions and reach identical results, are mechanical equivalents. In both machines the lining mechanism is physically located between the trucks, meaning between the front dolly and the wheels of the tamper. There is no dispute that both machines transmit the lining reaction to the rails. In this court's view, the reaction pads represent "patent" engineering. Taking the lining reaction on pads partially under the front wheels or totally on the front wheels of the tamper are clearly mechanical equivalents.

Any differences between Canron's Torsion Beam Machine and Claims 1 and 2 of Plasser's '297 patent in suit are either improvements thereon or mechanical equivalents thereof. This court finds a full response to claims 1 and 2 of the '297 patent in suit.

## CONCLUSION

On the credible evidence before this court, it appears that Claims 1–4 of the '360 patent and Claims 1 and 2 of the '297 patent, are valid and infringed. Plasser is entitled to an injunction against further infringement on the '360 by the Torsion Beam Machine and on the '297 by the Mark III and the Torsion Beam. Plasser shall be awarded the damages which resulted from the infringement and a trebling thereof. This court also finds that Canron has wilfully and deliberately infringed the patents in suit, having had prior knowledge and notice of them. Because of this wilful infringement, Plasser is entitled to its reasonable attorney's fees under Title 35, section 285, and to its costs.

Therefore, the Clerk shall enter judgment for Plasser against Canron:

a. Permanently enjoining Canron from manufacturing, using or selling any product embodying the invention claimed in either of the patents in suit;

b. For its damages for prior infringement, including interest, which said damages are trebled;

c. For its reasonable attorney's fees and its costs of suit.

The cause shall remain pending for determination of the issue of the amount of damages and the amount of Plasser's reasonable attorney's fees, by a subsequent trial of these issues to be set by this court.

AND IT IS SO ORDERED.